STATE, RESPONDENT, v. McSLOY, APPELLANT.

No. 9269.

Argued June 1, 1953. Decided July 24, 1953.

Amended on Denial of Rehearing October 16, 1953.

261 Pac. (2d) 663.

266

Charles L. Zimmerman, Butte, Arthur P. Acher, Helena for appellant.

Arnold H. Olsen, Atty. Gen., John L. McKeon, Asst. Atty. Gen., J. B. C. Knight, Special County Attorney for Deer Lodge County, Anaconda, for respondent.

Mr. Zimmerman, Mr. Acher and Mr. McKeon argued orally.

MR. JUSTICE ANGSTMAN:

Defendant has appealed from a judgment following the verdict of the jury finding him guilty of the infamous crime against nature and from an order denying his motion for a new trial.

By several specifications of error defendant contends that the information states more than one offense. The question was raised by demurrer, objection to the introduction of testimony, motion to elect and by motion in arrest of judgment. If the information charges more than one offense it is ground for demurrer. R. C. M. 1947, sec. 94-6703, subd. 3.

The information charges that defendant is accused "by this

information, of the crime of a felony, to-wit: The infamous crime against nature, committed as follows, to-wit: That at the County of Deer Lodge, State of Montana, on or about the 11th day of July, A. D., 1952, and before the filing of this information, the said defendant did wilfully, unlawfully, wrongfully, knowingly, intentionally, lewdly, forcibly and feloniously assault one James Connors, then and there, a male human being of the age of ten (10) years, and did then and there, commit the infamous crime against nature upon the person and body of the said James Connors, by then and there [here follows description of the means of committing the infamous crime against nature which was alleged to be per anus and per os].''

It is to be noted that the information characterizes the offense as the infamous crime against nature and then in describing the manner in which the crime was committed it alleged the assault.

The information here is not open to the charge that it is duplicitous. Allegations with respect to the assault are merely descriptive of the means of accomplishing the infamous crime against nature which never could be perpetrated against an unwilling participant without an assault.

The suggestion that there was a violation of sec. 16 of Article III of the Montana Constitution for not advising defendant of the nature and cause of the accusation against him is likewise without merit. He was charged with and conviction was sought for but one crime, that of the infamous crime against nature. The balance of the information concerning which defendant complains was merely descriptive of the method by which the crime was committed. The difference between this case and that of Dunn v. State, 50 Ariz. 473, 73 Pac. (2d) 107, relied on by defendant is patent. In that case the court had before it two different statutes. One defined assault with a deadly weapon and the other aggravated assault. The information was so drawn that it would appear both statutes had been violated. Defendant had no means of knowing on which charge the state sought conviction. Here defendant was not left in the dark as to the nature

and cause of the accusation. In plain and concise language he was accused of the infamous crime against nature, which of necessity, like the crime of rape, involved an assault as a part of the act. Such an information is not duplicitious. 42 C. J. S., Indictments and Informations, sec. 170, p. 1127; 27 Am. Jur., Indictments and Informations, sec. 125, p. 685; Peters v. State, 177 Ga. 772, 171 S. E. 266; Bevel v. State, 213 Miss. 208, 56 So. (2d) 500; People v. Pond, 390 Ill. 237, 61 N. E. (2d) 37; State v. Horton, 209 S. E. 151, 39 S. E. (2d) 222; Whitley v. State, 188 Ga. 177, 3 S. E. (2d) 588. And compare State v. Rees, 40 Mont. 571, 107 Pac. 893.

Defendant contends that he was unduly restricted in the right of cross-examination of some of the state's witnesses. The principal question in the case was that of identifying the person who committed the offense. To show how this question arose it is necessary to give a brief summary of the facts.

Defendant resides at Missoula. On July 11th he left Missoula ■ by automobile and according to his own testimony was going to Butte to secure a part for an automobile. Near Racetrack one of his tires went flat and he hitch-hiked a ride to Anaconda. He went to the Harlem Club in Anaconda and the owner of the club drove him back to his car. The tire was removed and taken to Opportunity where it was repaired; they then returned to the car and placed it on the wheel and returned to Anaconda. Defendant testified that he then returned to the Harlem Club at about 7:30 or 8:00 o'clock p. m. and remained there until after 10:00 p. m., but other witnesses testified that he did not return to the club until after 10:00 p. m. and he himself gave a different version of his whereabouts between 8:00 and 10:00 p. m. to policeman Derzay shortly after his arrest.

James Connors, the victim of the crime, testified that after he finished eating his evening meal he went to a nearby store for some candy. When returning he saw Freddie, known as Sonny, Martz talking to a man in a car on the street in Anaconda. He rode his bicycle beside the car on the driver's side and was asked by the driver if he would like a job tying knots. He asked where

the job was and was advised by the driver that it was west of town and would take only about a half hour. The witness accepted the job and got in the car, first leaving his bicycle in Junior Dahl's back yard. The driver who was identified by the witness as defendant, drove west of town, took a side road, choosing a secluded spot in the woods, and committed the act charged. The car was a Dodge bearing a Colorado license and the fly-window on the driver's side was broken. In accomplishing the act the boy was tied with a rope by having his hands tied to his ankles. After he was untied the boy ran to the home of Miss Hatcher, six and a half miles west of Anaconda, and she brought him to Anaconda.

Freddie Martz was with James Connors when defendant propositioned Connors to accept the job of tying knots. He saw James Connors enter defendant's automobile. He identified defendant as the one who drove away in the car with James Connors. On cross-examination he testified that his identification was based on the fact that defendant wore a blue shirt. The police report indicated that the person who committed the act wore a maroon shirt; the report showed that the word "maroon" had been stricken out and the word "blue" inserted. This correction was made at the request of Mr. Connors, father of James. Policeman Derzay who had the custody of the report explained how the correction came to be made, which was as follows: He said when he was questioning James Connors about the crime James was nervous and upset and it was hard to get the facts from him. When it came to the color of the shirt the witness testified: "His father and I tried to prompt him and asked him if it was a white shirt or medium colored or a dark shirt. Finally I said to the boy 'Was it this color?' and I thought he laid his hand on his dad's sweater, which was maroon color, but he had a blue shirt on underneath, a blue work shirt—then I said, 'Was it this color?' and Jimmy Connors said 'Yes.' I wrote down the color maroon for the shirt because I thought he was pointing to his dad's maroon sweater, but actually he was referring to his dad's blue shirt underneath." Freddie Martz

was positive that defendant wore a blue shirt; he also testified that the left fly-window of the automobile was broken.

The identification of defendant was sufficient to make the question one for the jury notwithstanding some discrepancy in the evidence bearing upon his description.

But defendant contends that he was unduly restricted in the ▪ cross-examination of Freddie Martz. On direct examination Freddie testified that defendant was the man who picked up James Connors in his automobile; he identified him in the court room and testified that he picked him out of five men who were seated in the sheriff's office shortly after the commission of the crime. On cross-examination Freddie Martz testified that defendant had on a blue shirt but he did not notice anything else about his clothing; he said that the only reason he picked out the man at the sheriff's office was because he was wearing a blue shirt. On redirect examination the following testimony was given by Freddie Martz:

"Q. Will you explain that answer, Sonny, when he asked you, 'Is the only way that you identified this defendant was by his blue shirt,' and you answered, 'Yes,' and now you answered that you didn't know what he meant. Now Sonny, will you explain that—in other words. Sonny, is the only way that you could identify the defendant over there was by his blue shirt—is that the only way, Sonny? A. No.

"Q. That's not the only way? A. No.

"Q. In what other way could you identify the defendant, Sonny? A. By his face.

"Q. By his face? A. Yes.

"Q. Anything else? A. His hair.

"Q. And his hair? A. Yes.

"Q. Now, he doesn't have a blue shirt on now, does he? Look at him now? A. I know it.

"Q. Do you recognize him as the man who talked to you from the automobile on July 11, 1953—1952? A. Yes.

"Q. Then by his blue shirt wasn't the only way that you

could identify this defendant, was it? You recognized the blue shirt, is that true? A. Yes.

"Q. And you also recognized that he had black, curly hair, isn't that true? A. Yes."

Defendant thereupon sought to further interrogate the witness but the court made the following statement: "Now just a moment. We have a rule in this court and I think that it is the rule in the State of Montana that you have a direct, cross and redirect examination and that is meant for the examination of all witnesses in this Court in the trial of cases. The court sees no purpose in further going into the examination of this witness. That is the rule in this Court." The record shows that defendant was permitted to examine the witness on cross-examination at great length. It is the right to re-cross-examination that he complains of here.

R. C. M. 1947, sec. 93-1901-10, in part provides: "A witness once examined cannot be re-examined as to the same matter without leave of the court, but he may be re-examined as to any new matter upon which he has been examined by the adverse party." And R. C. M. 1947, sec. 93-1901-3, provides: "The court must exercise a reasonable control over the mode of interrogation, so as to make it as rapid, as distinct, as little annoying to the witness, and as effective for the extraction of the truth as may be; but, subject to this rule, the parties may put such pertinent and legal questions as they see fit. The court, however, may stop the production of further evidence upon a particular point when the evidence upon it is already so full as to preclude reasonable doubt."

The record shows that defendant was permitted to ask all questions which he desired on cross-examination of the witness Martz relating to the question of the identification of defendant. In fact, repetition of many questions in that field of examination was quite common. We would be required to indulge in much speculation to conclude that defendant was in any way prejudiced by being denied the right to press the witness further on this subject of identifying the defendant.

There comes a time when examination on a given subject must close. Here the state on redirect examination did not bring out something new and on which defendant had not already fully examined the witness. While the court should not by a rule prohibit re-cross-examination of a witness as to new matters brought out on redirect examination, here there was no new matter developed on the redirect examination of the witness and re-cross-examination was properly denied. Compare State v. McConville, 64 Mont. 302, 209 Pac. 987, and State v. Biggs, 45 Mont. 400, 123 Pac. 410.

In the McConville Case, supra [64 Mont. 302, 209 Pac. 988], the court gave expression to views which are decisive of the question here as follows: "This court has announced the rule repeatedly that the widest latitude, compatible with well-settled principles of the law of evidence, should be allowed in cross-examination; but no court has ever stamped with approval the theory that even in a criminal case of this character, no limit can be set upon the cross-examination of the prosecuting witness, save only such as is dictated by the whim or caprice of the examining counsel.

"Speaking strictly, the alleged errors now under review do not raise the question of undue restriction of cross-examination. There is not any complaint made that defendant's counsel were not permitted to interrogate the witness as to any facts stated in her direct examination or connected therewith; on the contrary, they did examine her at great length upon every proper subject. Reduced to its simplest terms, the complaint amounts to nothing more than this that they were not permitted to have the same questions answered over and over again. In this form the bare statement of the proposition is its own refutation. The court did not err in its rulings."

Defendant contends that he was denied the right to further examine the prosecuting witness James Connors after the state had examined him on redirect examination. The court pointed out that the redirect examination did not elicit any new matter requiring re-cross-examination.

What we have already said in connection with the right to re-cross-examination of the witness Freddie Martz has equal application here and the court did not abuse its discretion in denying the right to re-cross-examine the prosecuting witness, where, as here, no new matter was developed on which the witness had not already been fully examined by counsel for defendant.

Defendant contends that the court erred in not permitting him ▮ to impeach the witness Mrs. Jackie Harris by showing that she had made a statement inconsistent with what she testified to on the witness stand. The court did not err in its ruling. Proper foundation had not been made for the impeachment. The witness Mrs. Jackie Harris was not asked whether at a given time and place and with certain persons present she had made the statement sought to be shown. She was not confronted with the so-called impeaching statement and hence the foundation for impeachment was not laid.

Defendant assigns error in limiting cross-examination of the ▮▮ prosecuting witness relative to a juvenile charge and in the following statement of the court in connection therewith: ''The Court will make this statement. There is no record of a juvenile charge being filed in the District Court of this District that shows that the Complaining Witness has been charged with any offense or that he made complaint.''

Defendant's counsel opened the door for the statement made by the court by the type of questions propounded to the witness Jimmy Connors implying that there had been such proceedings instituted.

This court is committed to the view that evidence of similar offenses claimed to have been committed by defendant is inadmissible. State v. Searle, 125 Mont. 467, 239 Pac. (2d) 995. Whether the prosecuting witness had been victimized by another at a different time and place, or whether he made complaint against another person is incompetent and inadmissible.

Error is assigned in permitting Pat Connors, the father of ▮ prosecuting witness, to testify as to what he observed when the witness Martz identified defendant in the sheriff's office.

He testified: "Mr. Derzay called Sonny Martz into the office where .they placed various men in a line-up around the office—men in plain clothes, and these men were mostly dressed for the rodeo—it was about the time of the rodeo here in Anaconda and they were dressed up in western outfits, plaid shirts, etc., and they asked Sonny Martz if he saw the man in here that had offered him the job and the ride, and the boy said, 'That's the man,' and the door to the office was open a little and Mr. Derzay told Sonny to go over and touch the man."

The cases bearing upon this method of proving the identification of defendant are in conflict but the trend of recent cases is to admit such evidence.

In the note in 70 A. L. R. 911 it is said: "There is a wide split of authority on the question of the competency of the evidence of extrajudicial identification in a trial where the identity of the accused as the person guilty of the crime is in dispute. Formerly the rule excluding such testimony was applied by far the greater number of courts. In recent years, however, the tendency has been towards the admission of such testimony both as substantive and corroborative evidence, so that now there exists a fairly balanced weight of authority on the question, with a slight preponderance of jurisdictions favoring admission." See 20 Am. Jur., Evidence, sec. 353, p. 326.

Mr. Wigmore in his work on Evidence discusses this question as follows: "Ordinarily, when a witness is asked to *identify* the assailant, or thief, or other person who is the subject of his testimony, the witness' act of pointing out the accused (or other person), then and there in the court-room, is of little testimonial force. After all that has intervened, it would seldom happen that the witness would not have come to believe in the person's identity. The failure to recognize would tell for the accused; but the affirmative recognition might mean little against him.

"The psychology of the situation is practically the same as when Recent Contrivance is alleged. To corroborate the witness, therefore, it is *entirely proper* (on the principle of sec. 1129, ante) to prove that *at a former time,* when the suggestions of

others could not have intervened to create a fancied recognition in the witness' mind, he recognized and declared the present accused to be the person. If, moreover (as sometimes is done) the person was then so placed among others that all probability of suggestion (by seeing him handcuffed, for example) is still further removed, the evidence becomes stronger. The typical illustration is that of the identification of an accused person at the time of arrest * * *.

"This is a simple dictate of common sense, and was never doubted in orthodox practice. That some modern Courts are on record for rejecting such evidence is a telling illustration of the power of a technical rule of thumb to paralyze the judicial nerves of natural reasoning." IV Wigmore on Evidence, 3d ed., sec. 1130, pp. 208, 210. Many cases are there cited, some taking the one view and some the other. In the note on page 214 the author in criticizing an Oklahoma case excluding such testimony said, "Courts are lamentably blind to the error of this doctrine, which flies in the face of common experience."

The court did not err in permitting the witness to testify as to what he saw and observed regarding the identification. The only effect of the corroborating evidence is to show that the prosecuting witness identified the accused at a time when there had been no opportunity for the witness to be swayed by any suggestion of others. Defendant's counsel was still privileged to argue to the jury that the witness was mistaken in the identification, and this is so whether one or a dozen persons witnessed the identification. In other words, the correctness of the identification still depends upon the accuracy of the recollections of the one person making the identification.

Finding no reversible error in the record, the judgment is affirmed.

MR. CHIEF JUSTICE ADAIR, and ASSOCIATE JUSTICES BOTTOMLY, FREEBOURN and ANDERSON, concur.