No. 95-357

IN THE SUPREME COURT OF THE STATE OF MONTANA

1997

STATE OF MONTANA,

        Plaintiff and Respondent,

    v.

FREDDIE JOE LAWRENCE,

        Defendant and Appellant.

FILED

OCT 21 1997

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    District Court of the First Judicial District,
                In and for the County of Lewis and Clark,
                The Honorable Dorothy McCarter, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

                Leo J. Gallagher, Helena, Montana

        For Respondent:

                Joseph P. Mazurek, Attorney General, Patricia J. Jordan, Assistant Attorney General, Helena, Montana; Mike McGrath, Lewis and Clark County Attorney, Carolyn Clemens, Deputy Lewis and Clark County Attorney, Helena, Montana

Submitted on Briefs: May 1, 1997

Decided: October 21, 1997

Filed:

_____
Clerk

Justice William E. Hunt, Sr. delivered the Opinion of the Court.

Defendant-Appellant Freddie Joe Lawrence (Appellant) and co-defendant Paul Kenneth Jenkins (Jenkins) were charged with deliberate homicide, aggravated kidnaping, and robbery. Defendants were tried simultaneously but with separate juries in the First Judicial District Court, Lewis & Clark County. Each jury found its respective defendant guilty on all counts and judgments of conviction were entered. (See companion case of State v. Jenkins, No. ADC 94-216, Lewis and Clark County; Mont. No. 95-352). Defendants appealed their convictions and we consider each appeal separately. Appellant appeals the jury verdict and judgment of conviction of the First Judicial District Court, Lewis & Clark County. We affirm.

We address the following issues on appeal:

1. Did the District Court err in denying Appellant's motion to suppress incriminating statements he made to authorities on the ground that the statements were obtained involuntarily and in violation of *Miranda?*

2. Did the District Court err in admitting Mary Jenkins' prior inconsistent statements and Officer McCormack's testimony concerning Jimmy Lee Amos?

3. Did the District Court err in refusing to grant Appellant's motion for a new trial on the basis of newly discovered evidence?

4. Did the District Court err in refusing to grant Appellant's motion to dismiss the case for insufficient evidence?

2

BACKGROUND

On the morning of January 12, 1994, the body of Donna Meagher (Meagher) was discovered in a ditch west of Helena. Meagher had been working the night before at the Jackson Creek Saloon in Montana City and had failed to come home as scheduled. After her last customer left sometime after midnight, Meagher, working alone, closed the bar. Shortly thereafter, Meagher was confronted by her assailants, who forced her to reopen the bar. The assailants robbed the cash register and poker machines, taking approximately $3,300. Aside from the missing money, the bar was largely undisturbed. Meagher's truck was moved from the bar's parking lot to a location behind a building across the street. Meagher was then transported through Helena to a location west of town, where she was bludgeoned to death. Her body was found at that location the next day.

Meagher's murder generated extensive publicity in the Helena area and a substantial reward was offered to anyone providing information leading to the arrest and conviction of the perpetrators. Authorities were subsequently contacted by Dan Knipshield (Knipshield), Appellant's father-in-law, who implicated Appellant and Jenkins in the crime.

On August 31, 1994, three law enforcement officers traveled to West Yellowstone to talk to Appellant, who was incarcerated in the Park County jail on an unrelated offense. During the interview, Appellant denied any involvement in the crime but implicated Jenkins and another man, Jimmy Lee Amos (Amos), as being responsible. Appellant asked if he could be moved to the Jefferson County jail in Boulder to be closer to his family in exchange

3

for cooperating further. The officers obliged and on September 1, 1994, moved Appellant to the jail in Boulder. The officers subsequently interviewed him two more times; once on September 1, and again on September 2, 1994.

Based on the information obtained from Knipshield and Appellant, law enforcement officers traveled from Montana to Oklahoma to interview Jenkins, his wife Mary Jenkins, and Amos. At the conclusion of the police investigation, Appellant and Jenkins were arrested and charged with the robbery, kidnaping and homicide. The defendants were tried simultaneously before different juries and both were convicted on all counts. Additional facts will be provided as necessary to dispose of the issues raised.

DISCUSSION

*Issue 1*

Did the District Court err in denying Appellant's motion to suppress incriminating statements he made to authorities on the ground that the statements were obtained involuntarily and in violation of *Miranda?*

Appellant argues that any statements made to law enforcement during the three initial interviews should be suppressed because the State failed to meet its burden of proving that he was properly advised of his rights as mandated by Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, and that he voluntarily waived his rights. As support for his argument, Appellant relies on our decision in State v. Grey (1995), 274 Mont. 206, 907 P.2d 954, where we stated that failure to preserve any tangible record of a defendant

being advised of his rights and voluntarily waiving those rights would be "viewed with distrust" in determining whether a defendant has voluntarily waived his rights. Grey, 907 P.2d at 956. As further support, Appellant argues that the officers failed to comply with Edwards v. Arizona (1981), 451 U.S. 477, 101A S.Ct. 1880, 68 L.Ed.2d. 378, and cease the interview upon his assertion of his right to counsel.

This issue was the subject of a pre-trial suppression hearing, after which the District Court concluded that Appellant had been properly advised of his rights pursuant to *Miranda*, and had knowingly and voluntarily waived those rights. The District Court therefore refused to suppress any of the statements made during the interviews in question. Appellant asserts that the District Court erred in its conclusions and its ultimate denial of his motion to suppress.

This Court will not overturn a district court's findings of fact regarding suppression hearing evidence unless those findings are clearly erroneous. State v. Cassell (1996), 280 Mont. 397, 400, 932 P.2d 478, 479 (citation omitted). A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the trial court misapprehended the effect of the evidence, or if this Court is left with a definite and firm conviction that the district court made a mistake. Cassell, 932 P.2d at 479 (citing State v. Loh (1996), 275 Mont. 460, 475, 904 P.2d 587, 589). We review a district court's conclusions of law *de novo* to ensure that the court's interpretation of the law was correct. State v. Hardy (1996), 278 Mont. 5 16, 519,

926 P.2d 700,702 (citing Carbon County v. Union Reserve Coal Co. (1995), 271 Mont. 459, 469, 898 P.2d 680, 686).

Incriminating statements made while undergoing custodial interrogation are generally admissible so long as procurement of such statements comports with the Fifth Amendment right to be free from self-incrimination and the Fourteenth Amendment right to due process of law. State v. Allies (1979) 186 Mont. 99, 109,606 P.2d 1043, 1048-49. In Miranda, the United States Supreme Court held that "to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights," namely, the right to remain silent and the right to counsel. Miranda, 384 U.S. at 467, 469. Once apprised of his rights, if an individual unequivocally invokes any right, all questioning must cease. Miranda, 384 U.S. at 474; Edwards, 451 U.S. at 485. A reinterrogation may occur only if the accused himself initiates further communication with the police. Edwards, 451 U.S. at 485.

An individual may waive his rights only if the waiver has been made voluntarily, knowingly, and intelligently. Miranda, 384 U.S. at 444. Pursuant to § 46-13-301(1), MCA, a defendant may move to suppress a confession or admission on the ground that it was given involuntarily. The prosecution has the burden of proving by a preponderance of the evidence that the confession or admission was voluntary. Section 46-13-301(2), MCA. Voluntariness depends on the totality of circumstances, with no one fact being dispositive. Cassell, 932 P.2d at 480 (citing Loh, 914 P.2d at 601).

6

The totality of the circumstances includes the following factors among others: the defendant's age, experience, and level of education; the defendant's prior experience with the criminal justice system and police interrogation; whether the defendant was advised of his *Miranda* rights; and whether the police used impermissible practices to extract incriminating statements from the defendant. Cassell, 932 P.2d at 480 (citing Loh, 914 P.2d at 601-02). Physical coercion, psychological coercion, deception, use of threats, and direct or implied promises are all factors to be weighed in the Court's consideration of whether police employed impermissible practices to extract incriminating statements. Cassell, 932 P.2d at 480 (citing Loh, 914 P.2d at 602).

The task before this Court is to decide whether there exists substantial evidence supporting the District Court's determination that Appellant voluntarily, knowingly, and intelligently waived his rights. The following facts are undisputed. On the date of the first interrogation, August 31, 1994, Appellant was incarcerated in the Park County jail for an unrelated traffic offense. The officers investigating the Meagher homicide arrived at the Park County jail shortly after 1:00 p.m. and secured a coffee break room in which to conduct the interview with Appellant. The officers included Lewis and Clark County Sheriffs Detective Sam McCormack, Jefferson County Undersheriff Tim Campbell, and Montana State Criminal Investigation Bureau Agent Reed Scott. McCormack and Scott were smokers and obtained permission from the jail to smoke in the break room.

At approximately 1:30 p.m., the jailer brought Appellant into the room. McCormack advised Appellant of his *Miranda* rights and informed him that the officers wanted to ask him questions regarding the Donna Meagher homicide. Appellant said he understood his rights and would talk to the officers. This discussion was not memorialized other than in Agent Scott's notes indicating that the discussion had in fact taken place. The officers brought a tape recorder into the room with them, but decided not to use it initially, as it was the practice to first acquire information and then record the interviewee reciting the relevant facts in an organized fashion.

McCormack gave Appellant coffee and a cigarette and began asking questions. At this point, the parties' accounts of what transpired during the interview diverge. McCormack testified that he asked questions regarding Appellant's association with Jenkins, their exchange of vehicles, and a toy John Deere panel van. McCormack and Campbell testified that Appellant then "blew up," spilled his coffee, said they couldn't prove anything, and expressed his desire for an attorney. Scott recorded in his notes that Appellant "indicated he may possibly wish to speak with an attorney." McCormack could not remember what Appellant exactly said regarding his desire for an attorney. McCormack and Campbell testified that after this incident, McCormack stopped questioning and began to pack up his papers to leave. The officers testified that Appellant then reinitiated conversation by asking several times "What is going on?" and by making other statements about Amos' possible involvement in the crime and Jenkins' location in Oklahoma. McCormack and Campbell

testified that McCormack re-advised Appellant of his rights and told him they could not talk to him if he wanted an attorney, however Appellant said he wanted to talk. McCormack asked Appellant whether or not he wished to have an attorney present, to which Appellant replied he would talk to them without an attorney. Scott's notes indicate that Scott also verified Appellant's desire to continue the interview without an attorney. McCormack testified and Scott recorded that Appellant thereafter expressed his wish to be transported to the Jefferson County jail to be closer to his wife and children.

Appellant testified to a different turn of events. He testified that the officers confronted him with the evidence provided by Knipshield, and said that they had Appellant on tape and he had better tell them everything. Appellant asserted that after hearing this, he slammed his hands down, stood up, and said, "I want a fucking lawyer." Appellant testified that while Scott and Campbell cleaned up spilled coffee, McCormack tried to calm him down by giving him a cigarette and saying that he was not a suspect, that they were there only to ask questions. Appellant also testified that Scott indirectly threatened him by asking him what would happen to his children living in unsuitable living conditions. Appellant testified that he agreed to continue the interview without an attorney because he feared for his family.

The parties agree that the interview continued until approximately 5:00 p.m. at which time Appellant and the officers broke for dinner. Appellant testified that right after dinner he again asked for an attorney. McCormack and Campbell were not asked about this particular fact at the suppression hearing. At approximately 7:00 p.m. the interview resumed

9

and Appellant signed an advisement of rights and waiver form. Before signing, Appellant asked the officers whether he needed an attorney in order to sign the waiver, to which an officer replied he did not.

The officers asked more questions of Appellant and refined his statement until approximately 8:30 p.m. when they began taping his statement. The beginning of Appellant's taped statement contains the following discussion:

> Q: (By McCormack) Fred, we have uh talked to you for quite some time now.
> A: (By Appellant) Yes. Yes, you have.
> Q: And we have advised you of your rights.
> A: Yes, you have.
> Q: And you have in fact uh signed a rights form indicating you have been advised of those rights.
> A: Absolutely.
> Q: And you've agreed to talk to us.
> A: You bet ya'.
> Q: And this is in reference to the uh robbery/homicide at Jackson Creek uh back in January.
> A: Yes sir.

At approximately 9:30 p.m., the taping ended and the officers concluded the interview. Then Appellant asked to speak with Campbell alone. Campbell testified that after McCormack and Scott left the room, Appellant expressed his fear for his family and told Campbell, "I will tell you anything as long as I can see my kids." Campbell testified:

> I said that I am not going to accept that. I said . . . what you tell us has to be the truth. If you are going to be making stuff up, you know, it is not going to cut it. It has to be the truth. He said okay. [T]hen he said look, . . . I need to talk to my wife before I talk to you guys any more

Campbell then went out and discussed the matter with McCormack and Scott. The officers agreed to honor Appellant's request and made the necessary arrangements to take Appellant to Boulder. McCormack and Campbell testified that Appellant initiated this bargain and that no threats were ever made regarding Appellant's family.

On September 1, 1994, the officers transported Appellant to the Jefferson County jail in Boulder. At approximately 6:00 p.m., after giving Appellant the opportunity to speak with his wife in person, the officers conducted a second interview. McCormack advised Appellant of his rights and Appellant told the officers that everything he said in the first interview was "bullshit." When asked on the witness stand why he would make this statement, Appellant said he thought he had to talk in order to see his family. After this statement, McCormack left the room. Campbell testified that he then went to the grease board to write down facts and ascertain from Appellant which were true and which were false. However, Appellant testified that Scott told him changing minor details was one thing, but changing his whole story midstream was another. Appellant testified that Scott threatened to charge him with perjury and obstruction of justice if he changed his whole story. Scott was not available at the hearing to testify about this alleged threat and Campbell was not asked about it. Campbell testified that "at one point Reed (Scott) left the room." Appellant testified that after being threatened, he said, "Yea, I think I need a lawyer," but then agreed to continue talking. This interview ended at approximately 7:45 p.m..

11

On September 2, 1994, the officers conducted a third interview with Appellant which lasted about one hour. Campbell testified the officers advised Appellant of his rights and that Appellant said he understood. Although the specific *Miranda* and waiver were not taped, the following discussion was taped:

> Q: (By McCormack) Freddie, you've been advised of Rights before, is that correct?
> A: (By Appellant) Yeah I have, three times.
> Q: Do you understand three times?
> A: Absolutely.
> . .
> Q: [T]he night of the 3 1st of August, we conducted an interview with you in Livingston, Montana, is that correct?
> A: Yes sir.
> Q: At that time you were advised of your Rights. In fact signed a Rights form?
> A: Right.

Appellant also testified that he has experience with the *Miranda* warnings as a result of several prior arrests, and from watching television "cop shows."

Regarding these three interviews, McCormack and Campbell testified that no threats or promises were made to Appellant with respect to his family. Appellant testified that his fear for his family generated in part from having lost his kids before. McCormack and Campbell, separately and at different times, assured Appellant that they would attempt to make sure his family received better living quarters.

McCormack and Campbell also testified that no threats or promises were made to Appellant with respect to the death penalty. McCormack testified that in the first interview, he mentioned the Meagher homicide was a capital crime, but never threatened Appellant with

12

the death penalty. McCormack and Campbell testified that in Boulder, on the day Appellant was finally arrested, Appellant mentioned the death penalty. Campbell testified, "We skirted the subject. [W]e told him that is not us, that is the next step. That is the courts." Appellant testified that throughout the investigation, he was never treated inhumanely.

Having considered the totality of circumstances, we conclude that substantial evidence exists to support the District Court's finding that the State met its burden of showing by a preponderance of the evidence that Appellant's incriminating statements were made knowingly, intelligently and voluntarily. Appellant was timely advised of his Miranda rights four times: twice in the first interview and once in each subsequent interview. Appellant was familiar with *Miranda*, the criminal justice system, and police interrogations from prior arrests and from television. Appellant testified that he understood his rights. Each time he was advised of his rights, Appellant verbally agreed to speak with the officers without an attorney. Although the content of these discussions was not memorialized, the fact that these discussions occurred was memorialized at the beginning of each taped statement. Appellant also signed a voluntary waiver of rights form.

Appellant argues that the officers coerced him into talking by using impermissible practices including lengthy interrogations, the "good cop/bad cop" technique of questioning, misrepresentations that he was not a suspect, gifts of cigarettes, feigned concern for his family, threats to take his family away, and threats of the death penalty. As for the length of interviews, we determine that the sessions were not overly long or arduous. The first

interview lasted approximately five and one half hours with a two-hour break in the middle for dinner. The second interview lasted approximately two hours and the third interview lasted one hour. The credibility of the witnesses and the weight to be given their testimony is for the trial court's determination and our review is limited to determining whether there is substantial credible evidence supporting the District Court's findings. Based on the facts and circumstances gleaned from the record as recited above, we conclude that substantial credible evidence exists supporting the District Court's finding that Appellant's statements were not products of police coercion. The fact that Appellant himself initiated the bargain to be moved to Boulder to be near his family is but one fact among many refuting Appellant's assertion that officers threatened his family in order to extract a statement. The record is replete with other similar evidence refuting Appellant's allegation of impermissible police practices.

Appellant also argues that the officers failed to comply with Edwards and cease interrogation upon his assertion of his right to counsel. Edwards, 45 1 U.S. 484. The record supports the District Court's finding that the officers stopped questioning upon Appellant's assertion of his right to counsel. Similarly, the record supports the District Court's conclusion that Appellant's questions and statements pertaining to Amos and Jenkins made subsequent to his assertion of his right to counsel constituted a reinitiation of conversation by Appellant. The record also shows that after Appellant reinitiated conversation, the

14

officers re-advised him of his rights and Appellant re-affirmed that he would continue the interview without an attorney.

Appellant argues that even if substantial evidence exists supporting the District Court's findings, such evidence ought to be "viewed with distrust" in keeping with our decision in Grey. In Grey, we reversed a trial court's denial of the defendant's motion to suppress, concluding that the defendant was not adequately advised of his rights and did not voluntarily waive them. Grey, 907 P.2d at 955. Several factors led us to this conclusion: the officer advised the defendant of his rights before bringing the defendant to the interrogation room; the officer could not remember exactly what he said to advise the defendant of his rights; the officer did not have the defendant sign a waiver form because he did not want to jeopardize the interrogation; and, the officer interpreted the defendant's act of talking to the officers as an implied waiver, rather than getting his express verbal or written waiver. Grey, 907 P.2d at 955. Moreover, the officers engaged in lying and deceit to obtain Grey's confession. Grey, 907 P.2d at 955.

As part of our holding in Grey, we expressed a strong preference for officers recording the giving and waiver of **Miranda:**

> [I]n the context of a custodial interrogation conducted at the station house or under similarly controlled circumstances, the failure of the police officer to preserve some tangible record of his or her giving of the **Miranda** warning and the knowing, intelligent waiver by the detainee will be viewed with distrust in the judicial assessment of voluntariness under the totality of circumstances surrounding the confession or admission.

Grey, 907 P.2d at 956. As in Grey, Appellant urges this Court to "view with distrust" the evidence supporting the voluntariness of his incriminating statements because the officers consciously decided not to tape record the giving and waiver of *Miranda.*

While we strongly agree with the principle embodied in Appellant's argument, that police should preserve a tangible record of the giving and waiver of *Miranda,* we reject his argument for several reasons. First, the interviews in question took place in 1994, over a year before Grey was decided. Thus, at the time of the interrogations and the suppression hearing, neither the officers nor the District Court had notice of this Court's preference that officers preserve some tangible record of the giving and waiver of *Miranda.* Second, although we expressed a strong preference for recording the giving and waiver of *Miranda,* we specifically declined to *require* such recordings, noting that this was more properly a function of the legislature. Grey, 907 P.2d at 955-56. Finally, Grey is factually distinguishable from the instant case.

In Grey, the defendant was inadequately advised of his rights and there was no evidence that he waived his rights. In the instant case, although the giving and waiver of *Miranda* was not tape recorded, Appellant's taped statements, his signed waiver form, and witness testimony provided the District Court with clear evidence from which to find that Appellant was adequately advised of his rights and voluntarily waived them. In a case similar to the instant case, Cassell, we held:

> Law enforcement officers should be encouraged to preserve a tangible record
> of advising defendants of their rights and a defendant's waiver of those rights.

16

> To the extent that they do not, that failure will be viewed with distrust. We declined in *Grey*, however, to require that interviews be tape recorded. How the record is preserved is still up to the law enforcement officers. *Grey* did not set out a rule of exclusion, but a guideline for weighing evidence. Here, the law enforcement officers established to the court's satisfaction that the ***Miranda*** warnings were properly given and that no impermissible tactics were used and that under the totality of the circumstances the confessions were voluntary. That is all that is required. The fact that the warnings and waiver were not preserved tangibly, even if viewed with distrust, does not terminate the inquiry, if the court is satisfied from all the available evidence, that the State's burden of proof was met.

Cassell, 932 P.2d at 481. Our holding in Cassell applies to the instant case as well. e officers' failure to record the giving and waiver of ***Miranda*** does not vitiate the other evidence in the record supporting the conclusion that Appellant's waiver of rights was voluntary.

Although in this case we decline to reverse on the basis of Grey, we again stress the import of Grey and emphasize the caveat we announced in Cassell: In the future, law enforcement officers should preserve a tangible record of the giving and waiver of ***Miranda*** when the means to do so are readily available. Failure to do so will result in extreme disfavor with the Court in later determining the voluntariness of a ***Miranda*** waiver.

Accordingly, we hold that the District Court's findings of fact regarding the evidence in Appellant's suppression hearing were not clearly erroneous, and that the District Court did not err in denying Appellant's motion to suppress his incriminating statements,

17

Did the District Court err in admitting Mary Jenkins' prior inconsistent statements and Officer McCormack's testimony concerning Jimmy Lee Amos?

The standard of review for evidentiary rulings is whether the district court abused its discretion. State v. Gollehon (1993), 262 Mont. 293, 301, 864 P.2d 1257, 1263. The determination of whether evidence is relevant and admissible is left to the sound discretion of the trial judge and will not be overturned absent a showing of abuse of discretion. Gollehon, 864 P.2d at 1263. We consider Mary Jenkins' prior inconsistent statements and Officer McCormack's testimony separately.

*A. Mary Jenkins ' Prior Inconsistent Statements*

Prior to trial, Mary Jenkins participated in five interviews with investigating officers during which Mary answered several questions concerning the events surrounding the homicide. In some interviews, Mary would answer the questions with declarative statements of fact. However, in other interviews, when asked the same or similar questions, Mary would answer with non-committal statements of "I don't know" or "I can't remember." Mary suffers from memory lapses much more acute and frequent than the average person. Dr. William Stratford examined Mary in connection with a pre-trial hearing to determine her competency to testify. Dr. Stratford diagnosed her condition as dementia, most likely of the Alzheimer's type. Despite her ailment, the District Court ruled that Mary was competent to testify.

At trial, on direct examination, the prosecution asked Mary the same or similar questions as had been asked of her during the interviews. Although Mary answered some questions definitively, most of her testimony was that she couldn't remember. On cross-examination, Mary often retracted her definitive answers that she made on direct by saying she could not remember. When prompted with leading questions, Mary could remember the circumstances of some interviews, but could not remember giving a taped statement in Oklahoma. Mary was aware of her memory limitations, stating "I have good days and sometimes bad days. In my bad days I tend to forget a whole lot of stuff."

Later in the trial, the prosecution attempted to introduce the content of Mary's prior declarative statements through the testimony of the interviewing officers. Appellant objected on the ground that such testimony was improper hearsay because the prosecution failed to meet the foundational requirements of the hearsay exception for prior consistent statements. The District Court overruled the objection stating:

> I am going to allow Mary's prior statements because the prior statements are a mixture of consistent and inconsistent statements and it probably is necessary to allow all of that in for the jury to understand what was said. It is not going to make any sense to them to have bits and pieces of prior statements coming in. [Regarding] Mary's testimony[,] . . . first she would testify as to a fact, and then later she would testify that she really didn't remember that fact, and that she wasn't sure whether or not it was a fact or whether it was suggested to her by someone else. So any statements given previously to the investigator[s] are both consistent and inconsistent with respect to her conflicting [testimony] at trial. So considering all of that I am going to let it all in.

On appeal, Appellant argues that the District Court erred in admitting testimony concerning Mary's prior declarative statements. Appellant's argument centers upon the hearsay exceptions contained in Rule 801(d)(l), M.R.Evid., which provides:

> **Statements which are not hearsay.** A statement is not hearsay if--
> **(1) Prior statement by witness.** The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the declarant's testimony, or (B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of subsequent fabrication, improper influence or motive . . . .

Appellant asserts that the State was not trying to impeach Mary through the use of prior inconsistent statements under 801(d)(l)(A), but rather trying to bolster her credibility through the use of prior consistent statements under 801(d)(l)(B). Appellant correctly states that in order to introduce a witness's prior consistent statements, the proponent must first lay the necessary foundation as outlined in Rule 801(d)(l)(B) and State v. Lundstad (1993), 259 Mont. 512,517, 857 P.2d 723,726 (holding that a declarant's prior consistent out-of-court statements are admissible only when those statements were made before the alleged fabrication, improper influence, or motive arose). See also, Tome v. United States (1995), 513 U.S. 150, 115 S.Ct. 696, 130 L.Ed.2d 574. Appellant argues that the State failed to lay the necessary foundation, and that the District Court's admission of the officers' testimony concerning Mary's prior consistent statements, absent foundation, resulted in error.

The State counters that Mary's statements at trial, that she did not know or could not remember certain facts, were inconsistent, rather than consistent, with her prior declarations

of fact. The State argues that under Rule 801(d)(1)(A), M.R.Evid., the District Court properly admitted Mary's prior statements.

Analysis of whether the District Court abused its discretion in applying Sol(d)(l)(A) instead of 801(d)(l)(B), requires a preliminary discussion about the meaning of *inconsistency.* In Montana, there exist two divergent holdings on the issue of whether a lapse of memory concerning a fact is inconsistent with a prior declaration of that fact.

Appellant cites State v. Goodwin (1991), 249 Mont. 1, 13, 813 P.2d 953, 960, for the proposition that statements of "I don't know" or "I don't remember" are consistent with prior declarations of fact. In Goodwin, the defendant was charged with sexual intercourse without consent with his teenage daughter. Goodwin, 813 P.2d at 955. Prior to trial, the daughter allegedly told her grandmother that she did not think her father had acted for sexual gratification. Goodwin, 813 P.2d at 960. At trial, the daughter testified she could not remember what she had told her grandmother concerning this fact. Goodwin, 813 P.2d at 960. Without citation to authority, we concluded that the daughter's prior statement to her grandmother "was not inconsistent with her trial testimony" and that the district court properly excluded the prior statement as hearsay evidence. Goodwin, 813 P.2d at 960.

The State on the other hand cites State v. Devlin (1991), 251 Mont. 278, 281-82, 825 P.2d 185, 187, for the opposite proposition that a witness' claimed lapse of memory as to certain facts is inconsistent with any prior declarative statements concerning those facts. Devlin was decided six months after Goodwin, and involved a defendant charged with

21

aggravated assault. Devlin, 825 P.2d at 185. Prior to trial, the investigating officer taped a statement of the defendant's daughter during which she told him that her father said "Your mom's having men around here again" and that she saw him strike the victim with a stool leg. Devlin, 825 P.2d at 186. At trial, the daughter testified that she could not remember what her father said and that she did not see him actually strike the victim with a stool leg. Devlin, 825 P.2d at 186. We held that the daughter's claimed lapse of memory was an inconsistency within the meaning of Rule 801(d)(l)(A), and that the district court did not err in admitting her prior taped statement. Devlin, 825 P.2d at 187. In reaching this conclusion, we relied on State v. Charlo (1987), 226 Mont. 213, 216-17, 735 P.2d 278, 280. In Charlo, we determined that the testimony of two declarants, that they "did not know" or "could not remember" certain facts, was inconsistent with their prior taped statements regarding facts that they knew and remembered. Charlo, 735 P.2d at 280.

Our research reveals other cases in which this Court construed a witness' claimed lapse of memory at trial as inconsistent with his prior declaration of fact. See Wingate v. Davis (1926), 77 Mont. 572, 579, 252 P. 307, 310; and State v. Jolly (1941), 112 Mont. 352, 355, 116 P.2d 686, 687-88.

As further support for its position, the State cites the Commission Comments to Rule 801(d)(l)(A) at 422 which provide:

> It is the intent of the Commission that a witness' failure to recollect at a trial or hearing is an inconsistency under 801(d)(l)(A) when a witness has made a prior statement on the matter under inquiry.

Given the weight of authority, we believe <u>Devlin</u> is the better reasoned opinion, and hold that a claimed lapse of memory is an inconsistency within the meaning of Rule 801 (d)(l)(A). To the extent that our prior decision in <u>Goodwin</u> is inconsistent with this holding, it is overruled.

We now apply our holding to the facts of the instant case. Appellant identified approximately five statements Mary made at trial that were consistent with her prior declarations as related by the officers. However, reviewing the transcript as a whole, and the discussion between counsel and the district court judge in chambers in particular, it appears that the nature of Mary's trial testimony made it especially difficult for the District Court to parse out specific inconsistent and consistent statements. The District Court found that Mary's inability to remember, as well as her tendency to retract on cross examination facts which she had stated on direct examination, rendered the majority of Mary's trial testimony inconsistent with her prior declarative statements made to the officers.

We conclude that the District Court did not abuse its discretion in characterizing Mary's lapses of memory as inconsistent with her prior declarative statements to officers. Given this inconsistency, we conclude that the District Court did not abuse its discretion in applying 801(d)(l)(A) instead of 801(d)(l)(B). We also conclude that the District Court did not abuse its discretion in admitting some consistent statements with the inconsistent ones for reasons of judicial efficiency and assisting the jury.

Having concluded that the District Court did not err in applying Rule 801(d)( 1)(A), we do not reach Appellant's argument pertaining to the foundational requirements of Rule 801(d)(l)(B). However, we do reach Appellant's argument pertaining to the foundational requirements of Rule 6 13.

Appellant asserts that the District Court erred in admitting extrinsic evidence of Mary's prior statements because the State failed to establish a proper foundation as prescribed by Rule 613(b). Rule 613(b), M.R.Evid., provides:

> Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests ofjustice otherwise require.

First, Appellant argues that Mary was not afforded the opportunity to explain or deny her prior statement because the State did not specifically ask Mary about the particulars concerning her prior statements to officers. Appellant cites State v. McSloy (1953), 127 Mont. 265, 273, 261 P.2d 663, 667, for the rule that a party seeking introduction of a witness' prior statement must first confront the witness with the particulars of the prior statement by asking the witness whether the witness recalls that at a certain time and place, with certain persons present, the witness made the prior statement.

Appellant's reliance on McSloy is misplaced. In McSloy, we interpreted section 93-1901-12, R.C.M. (1947). However, that statute is no longer in effect as it was superseded by Rule 613(b), M.R.Evid. The Commission Comments to Rule 613(b) at 373 specifically state:

The usual requirement for a foundation commonly required with this method of impeachment has been modified. This subdivision allows the witness to explain and the opposite party to examine concerning the prior inconsistent statement, but "with no specification of any particular time or sequence." [Advisory Committee's Note, 56 F.R.D. at 279.] [T]o the extent that this subdivision does not require that the foundation be laid before impeachment occurs, this subdivision supersedes [section 93-1901-12, R.C.M.(1947)] and cases.

To the extent McSloy is inconsistent with Rule 613(b), it is overruled. Our research does not reveal any cases citing McSloy for the particular position here advanced by Appellant, but if any exist, they too are overruled to the extent they are inconsistent with Rule 613(b). Thus, Appellant's argument on this point is without merit. Furthermore, the record reveals that on direct-examination the prosecution asked Mary about the substance of her prior statements and whether she remembered speaking with officers. On cross-examination, the defense also asked Mary whether she remembered speaking to officers and asked her about her inability to remember. Under these circumstances, we conclude that Mary was in fact afforded the opportunity to explain or deny her prior statements made to officers.

Appellant next argues that the State failed to establish a proper foundation under 613(b), because he was not afforded a fair opportunity to cross-examine Mary concerning her prior statements made to the officers. Appellant bases his argument on Kopischke v. First Continental Corp. (1980), 187 Mont. 471, 610 P.2d 668.

Kopischke involved a products liability claim against an automobile dealer. Kopischke, 610 P.2d at 669. At trial, the plaintiff testified, was cross-examined, and then

25

was excused to go home because of her physical condition. Kouischke, 610 P.2d at 688. Later, in the absence of plaintiff, counsel for defendant attempted to impeach plaintiff by introducing her pre-trial deposition which contained certain inconsistent statements. Kopischke, 610 P.2d at 688. The trial court sustained plaintiffs counsel's objection to the evidence on grounds of repetition and lack of foundation under Rule 613(b). Kopischke, 610 P.2d at 688. On appeal, we held:

> The witness was not on the stand. [The deposition] was not admissible unless the witness had an opportunity to explain or deny the same, and the opposite party was afforded the opportunity to interrogate her on the deposition. This foundational requirement not having been met by the cross-examiner, the District Court was correct in denying the admission into evidence of the deposition or any part of it under Rule 6 13(b) .

Koaischke, 610 P.2d at 689.

Appellant asserts that the instant case is analogous to Kopischke because the District Court excused Mary as a witness, and she went home to Oklahoma before evidence of her prior statements was admitted. Similar to Kopischke, Appellant argues that "[t]he jury and the defense were not afforded the opportunity of learning from Mary about her recollection of the circumstances surrounding her prior statement."

We disagree. Appellant's argument fails in that Kopischke is distinguishable from the instant case. In Konischke, the plaintiff was never afforded an opportunity to explain or deny her prior statements, and the defendant was never afforded the opportunity to cross-examine the plaintiff concerning these prior statements. However, in the instant case, the prosecution asked Mary about her prior statements on direct-examination and Appellant

26

asked Mary about her inability to remember on cross-examination. As stated above, Rule 613(b) does not require impeachment evidence of prior inconsistent statements to be offered during cross-examination of the witness. Where, as in this case, opposing counsel has had full opportunity to cross-examine the witness regarding the prior inconsistent statements, no error exists in admitting the statements after the witness has been excused.

Lastly, Appellant contends that admission of Mary's prior inconsistent statements violated his Sixth Amendment right to confrontation. Appellant maintains that Mary's lapses of memory while on the stand, along with her later absence from trial during the admission of her prior inconsistent statements, so limited his ability to cross-examine her concerning the veracity of those statements as to amount to a denial of confrontation. Also, on appeal, Appellant contends that Mary's dementia was so acute that it precluded him from effectively cross-examining her, amounting to a complete denial of his right to confront her as a witness.

We decline to address the issue of confrontation on the merits. This issue is not properly before us because it was not properly raised in the District Court. In Montana, "[t]he law is that one must object to improper testimony when it is offered or abide the result; failure to object at the proper time waives the error." Labbitt v. Bunston (1929), 84 Mont. 597, 599, 277 P. 620, 621. Further, if a timely objection is made at trial, counsel is not permitted to later change the ground for objection on appeal. Forquer v. North (1910), 42 Mont. 272, 286, 112 P. 439, 444 ("The question was objected to, but not for the reason urged

against it in this court. Under these circumstances, we cannot consider the specification of error."). These rules are codified in Rule 103(a)(l), M.R.Evid., which provides:

> Error may not be predicated upon a ruling which admits evidence unless … a timely objection or motion to strike appears of record stating the specific ground of objection, if the specific ground was not apparent from the context.

Similarly, § 46-20-104(2), MCA, provides:

> Upon appeal from a judgment, the court may review the verdict or decision and any alleged error objected to which involves the merits or necessarily affects the judgment. Failure to make a timely objection during trial constitutes a waiver of the objection except as provided in 46-20-701(2).

With respect to Appellant's first contention, our review of the record reveals that at trial, Appellant objected to the admission of Mary's prior statements only on the specific ground of Rule 801(d)( I), not on the ground of a denial of confrontation. As to Appellant's second contention concerning Mary's testimony as a whole, the record shows that at a pre-trial stage, after Appellant learned of the District Court's ruling that Mary was competent to testify, Appellant mentioned, in passing, the potential problem of confrontation. However, at trial, Appellant failed to object to Mary's testimony on grounds of confrontation. Because Appellant failed to object at trial, he waived the opportunity to raise the confrontation issue on appeal.

Even though Appellant failed to preserve the confrontation issue for appeal, we are nonetheless required to consider the issue if Appellant meets the elements listed under Montana's plain error statute, § 46-20-701, MCA. That statute provides:

**Elements of record court considers on review--errors noticed.**

28

(2) Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.  A claim alleging an error affecting jurisdictional or constitutional rights may not be noticed on appeal if the alleged error was not objected to as provided in 46-20-104, unless the convicted person establishes that the error was prejudicial as to the convicted person's guilt or punishment  *and*  *that:*

    (a)  the right asserted in the claim did not exist at the time of the trial and has been determined to be retroactive in its application;

    (b) the prosecutor, the judge, or a law enforcement agency suppressed evidence from the convicted person or the convicted person's attorney that prevented the claim from being raised and disposed of; *or*

    (c) material and controlling facts upon which the claim is predicated were not known to the convicted person or the convicted person's attorney and could not have been ascertained by the exercise of reasonable diligence. [Emphasis added.]

We need not consider whether Appellant establishes prejudicial error, because Appellant does not meet any of the requirements listed under (a), (b), or (c) of § 46-20-701(2), MCA. Appellant's right to confront witnesses existed at the time of trial, no evidence was suppressed from Appellant preventing his claim from being raised, and the material facts upon which Appellant bases his claim were known to him at the time of trial. Because Appellant fails to meet the requirements of § 46-20-701(2), MCA, we do not consider his constitutional claim raised for the first time on appeal.

Given the foregoing analysis pertaining to Mary's prior out-of-court statements, we conclude that the District Court did not abuse its discretion in characterizing Mary's prior statements as inconsistent; did not abuse its discretion in applying Rule 801(d)(1)(A), M.R.Evid., rather than Rule 801(d)(1)(B); and did not abuse its discretion in finding that the

29

prosecution met the foundational requirements of Rule 613(b) for introduction of Mary's prior inconsistent statements.

### B. *Officer McCormack's Testimony*

Appellant argues that the District Court abused its discretion when it admitted Officer McCormack's statements that (1) he interviewed Amos; and (2) based on information he received, he learned that Mary was probably involved in the kidnapping portion of the alleged crimes. Appellant contends that under Rule 801, M.R.Evid., these statements constitute inadmissible hearsay because Officer McCormack was indirectly testifying to what Amos said. As support for his argument, Appellant cites the following language from a treatise on evidence:

> [E]vidence as to the purport of "information received" by the witness, or testimony of the results of investigations made by other persons, offered as proof of the facts asserted out of court, are properly classed as hearsay.

2 John William Strong et al., McCormick On Evidence § 249, at 104-05 (4th ed. 1992).

The State counters that Appellant has taken the officer's statements out of context and has mischaracterized the content of Officer McCormack's testimony. The State argues that the officer's testimony, "we had received information that Mary was probably involved," refers to the information gathered from the entire investigation, not just from Amos. The State points out that the two statements in issue were elicited in the larger context of Officer McCormack's account of the facts and circumstances leading up to the interview with Mary and the eventual arrest of the two defendants. The State also points to the trial transcript

which shows that a considerable amount of testimony occurred between the making of the two statements. The State argues that when the two statements are viewed in the proper context, no reasonable jury would infer that Officer McCormack learned of Mary's involvement solely by information received from Amos.

The State further argues that even if the jury inferred that the information received was from Amos, the statements were still admissible because they were not offered for the truth of the matter asserted, and thus, not hearsay. The State notes that during cross-examination of Mary, defense sought to impeach her testimony with evidence that Officer McCormack threatened her by telling her she could be charged as an accomplice if she didn't talk. The State contends that Officer McCormack's testimony was offered to rebut the defense's charge that he used deceptive practices to get Mary to talk, and to explain to the jury that his belief as to Mary's involvement was not groundless, but based on information received. The State also notes that any error was cured by the District Court's limiting instruction, that the jury was not to speculate as to what Amos might have said.

An examination of the record makes clear that Officer McCormack's statements are more properly viewed in the larger context of his investigation of the crimes, the facts and circumstances leading up to the interview with Mary, and the eventual arrest of the two defendants. Given the separation in time between the two statements, and the fact that none of Amos' statements were actually placed before the jury, we conclude that no reasonable

possibility exists that the jury inferred that Officer McCormack's information as to Mary's involvement came exclusively from Amos.

Even if we assume, *arguendo*, that the jury inferred from Officer McCormack's testimony that Amos told him of Mary's involvement, his testimony is still admissible as nonhearsay. Montana Rules of Evidence define hearsay as an out-of-court statement "offered in evidence to prove the truth of the matter asserted." Rule 801(c), M.R.Evid. We have not had occasion to rule on the issue of whether the hearsay rule applies to statements offered to show their effect on the hearer, therefore, we look to other jurisdictions for guidance.

The State cites People v. Tenorio (Colo. 1979), 590 P.2d 952, 957-58, for the proposition that out-of-court statements offered for the limited purpose of explaining an officer's conduct are not hearsay. In Tenorio, the trial court issued a pre-trial order ruling that officers could only testify that "they had received a call on an incident involving a man of the defendant's description, but that they must refrain from mentioning that the individual was reported to be drunk and brandishing a weapon." Tenorio, 590 P.2d at 957. At trial, on direct examination, the officer kept within his bounds of testimony. Tenorio, 590 P.2d at 957. On cross-examination, the defense asked the officer whether he had his gun drawn to which the officer replied "yes." Tenorio, 590 P.2d at 958. On redirect, the prosecution asked the officer why his gun was drawn and the officer replied, "Because the individual was purported to have a weapon." Tenorio, 590 P.2d at 958. In holding that the officer's statements were admissible nonhearsay, the Supreme Court of Colorado reasoned:

32

[The statements] were elicited only to establish the officers' reasons for initially going to the park and for drawing their guns after arrival there. The statements were not offered to show the truth of the contents of the radio report or to establish that the defendant did in fact possess a weapon.

Tenorio, 590 P.2d at 958. The court also noted that the prosecution had a right to rebut any implied charge by the defense of police misconduct and explain why he had his gun drawn. Tenorio, 590 P.2d at 958.

Other jurisdictions have held in accord with Tenorio, and have likewise ruled that out-of-court statements offered for the limited purpose of explaining an officer's conduct are admissible. See United States v. Martin (6th Cir. 1990), 897 F.2d 1368; United States v. Lazcano (7th Cir. 1989), 881 F.2d 402; United States v. Echeverry (9th Cir. 1985), 759 F.2d 1451; United States v. Love (4th Cir. 1985), 767 F.2d 1052; State v. Feliciano (Haw. Ct. App. 1982), 638 P.2d 866.

However, these and other jurisdictions have expressed the caveat that the above rule is not to be abused. Courts have held that while an officer may testify about actions taken in response to information received, such testimony is inadmissible if it "effectively points the finger of accusation at defendant." Fontenot v. State (Okla. Crim. App. 1994), 881 P.2d 69, 82 ("In other words, the State may not indirectly accomplish what the hearsay rule directly forbids."). Accord, Harris v. Wainright (1 lth Cir. 1985), 760 F.2d 1148, 1151-53 (error to allow officer's implied reference to an anonymous informant's help in identifying the defendant); United States v. Escobar (5th Cir. 1982), 674 F.2d 469, 474 (error to allow officer to testify that he ran name of the defendant through computer and obtained print-out

that he was a "known narcotics smuggler"); Stewart v. Cowan (6th Cir. 1976), 528 F.2d 79, 81, 86 n.4 (error to allow officer to testify that he had received several telephone calls from anonymous sources stating that the defendant shot the victim).

We adopt these courts' interpretation of the hearsay rule as applied to out-of-court statements offered for the purpose of explaining an officer's conduct. Applying this law to the facts of the instant case, we conclude that officer McCormack's statements, first, that he interviewed Amos, and later, that based on information received he learned of Mary's involvement in the crime, were admissible nonhearsay. Officer McCormack's statements were offered not to prove the truth of the matter asserted, but rather to explain the events leading up to his interview with Mary, and to rebut any implied charge of deceptive practices. Officer McCormack's statements did not "point the finger" at Appellant, or otherwise inculpate him in the commission of the crime. Therefore, we hold that the District Court did not abuse its discretion in allowing Officer McCormack's statements into evidence.

### Issue 3

Did the District Court err in refusing to grant Appellant's motion for a new trial on the basis of newly discovered evidence?

Appellant argues that the District Court erred when it denied his motion for a new trial based on newly discovered evidence. The new evidence consists of (1) a letter from the United States Army, dated August 20, 1969, containing information that Dan Knipshield suffered from episodic schizophrenia; and (2) undocumented information that Mary Jenkins

34

has night blindness. Appellant maintains that had these two items of evidence been presented to the jury, it would have reached a different verdict.

The standard of review of a denial of a motion for a new trial is whether the district court abused its discretion. State v. Fina (1995), 273 Mont. 171, 175, 902 P.2d 30, 33. In State v. Greeno (1959), 135 Mont. 580, 342 P.2d 1052, we set forth six criteria a district court must consider when evaluating a motion for a new trial based on newly discovered evidence:

> (1) That the evidence must have come to the knowledge of the applicant since the trial; (2) that it was not through want of diligence that it was not discovered earlier; (3) that it is so material that it would probably produce a different result upon another trial; (4) that it is not cumulative merely--that is, does not speak as to facts in relation to which there was evidence at the trial; (5) that the application must be supported by the affidavit of the witness whose evidence is alleged to have been newly discovered, or its absence accounted for; and (6) that the evidence must not be such as will only tend to impeach the character or credit of a witness.

Greeno, 342 P.2d at 1055. We note that the criteria are stated in the conjunctive; thus, all six criteria must be met or the motion fails. State v. Cyr (1987), 229 Mont. 337, 340, 746 P.2d 120, 122.

In the instant case, the District Court applied the *Greeno* criteria to both items of evidence and found that they did not meet the third and sixth criteria. Additionally, with respect to Mary's night blindness, the District Court found that it did not meet the second criterion.

We agree with the District Court's conclusion that the two items of evidence fail to satisfy the *Greeno* test. The new evidence of Knipshield's schizophrenia and of Mary's night blindness serves only to impeach the credibility of these two witnesses. Appellant seeks to cast doubt on Knipshield's truthfulness and on Mary's ability to testify from personal knowledge. Further, neither the single letter from 1969 mentioning episodic schizophrenia, nor the undocumented, unsupported information of Mary's night blindness, is so probative as to make a material difference in the jury's assessment of these witness' credibility. Thus, we do not believe the new evidence is so material that it would probably produce a different result upon a new trial. Finally, it appears that Appellant learned about Mary's night blindness from Mary's sister. Appellant communicated with Mary's sister in making arrangements for Mary's examination with Dr. Stratford. Thus, Appellant had the opportunity to question Mary's sister and discover Mary's night blindness before the trial. Given the failure of the new evidence to meet the *Greeno* criteria, we conclude that the District Court did not abuse its discretion in denying Appellant's motion for a new trial.

*Issue 4*

Did the District Court err in refusing to grant Appellant's motion to dismiss the case for insufficient evidence?

Section 46-16-403, MCA, provides that it is within the sound discretion of the District Court whether to dismiss an action at the close of the State's case for insufficient evidence. We will not disturb the District Court's ruling unless Appellant shows an abuse of discretion.

36

State v. Miller (1988), 231 Mont. 497, 509, 757 P.2d 1275, 1282. In construing the statute, we have held that a motion to dismiss for insufficient evidence "should be granted only where there is no evidence upon which a trier of fact could base a verdict." Miller, 757 P.2d at 1282 (citations omitted)(emphasis in original). The standard of review of the sufficiency of the evidence to support a conviction is whether, upon viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Miller, 757 P.2d at 1283 (citation omitted).

Appellant's argument of insufficient evidence is closely tied to the first three issues discussed in this opinion. Appellant contends that no rational trier of fact could have found the elements of the crimes beyond a reasonable doubt given the lack of physical evidence, Mary Jenkins' dementia, and Dan Knipshield's lack of credibility. We have held numerous times that circumstantial evidence is sufficient to support a conviction. Miller, 757 P.2d at 1284 (citations omitted). We have already held in this opinion that Mary's testimony was admissible. The credibility of witnesses is a question solely for the jury to decide. Further, the State cites ample corroborating evidence in its brief connecting Appellant to the crimes. Based on these considerations, we conclude that the District Court did not abuse its discretion in denying Appellant's motion to dismiss for insufficient evidence.

Affirmed.

_____
Justice

37

We Concur:

_____

_____

_____

_____
Justices