[Cite as *State v. Johnson*, 2024-Ohio-2518.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                CASE NO. 1-23-016

    v.

LYDIA JOHNSON,                    O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Allen County Common Pleas Court
Trial Court No. CR2022 0246

**Judgment Affirmed**

**Date of Decision: July 1, 2024**

**APPEARANCES:**

    *Chima R. Ekeh* **for Appellant**

    *John R. Willamowski, Jr.* **for Appellee**

**ZMUDA, J.**

{¶1} Defendant-appellant, Lydia Johnson ("Johnson"), appeals the March 9, 2023 judgment of conviction and sentence entered against her in the Allen County Court of Common Pleas, following a jury trial in which Johnson was found guilty of tampering with evidence. For the reasons that follow, we affirm.

*Procedural History*

{¶2} This case originated on August 11, 2022, when the Allen County grand jury returned a seven-count indictment against Johnson. In Counts 1 through 6 of the indictment, Johnson was charged with aggravated possession of drugs in violation of R.C. 2925.11(A), with Count 1 being a third-degree felony and Counts 2 through 6 being fifth-degree felonies. In Count 7 of the indictment, Johnson was charged with tampering with evidence, a third-degree felony in violation of R.C. 2921.12(A)(1).

{¶3} On August 22, 2022, an arraignment was held and Johnson pled not guilty to the indictment. Five months of pretrial proceedings then ensued.

{¶4} On January 23, 2023, a jury trial commenced in the case. During the course of the three-day trial, both the prosecution and the defense presented evidence.

{¶5} On January 25, 2023, the jury returned verdicts on all counts. Johnson was found not guilty on Counts 1 through 6 of the indictment, but was found guilty on Count 7. The trial court accepted the verdicts, discharged the jury, and ordered a presentence investigation.

{¶6} On March 8, 2023, a sentencing hearing was held and Johnson was sentenced to a three-year term of community control.

{¶7} On March 24, 2023, Johnson filed the instant appeal, in which she raises two assignments of error for our review.

**First Assignment of Error**

**Appellant's conviction for tampering with evidence was not supported by legally sufficient evidence and was otherwise against the manifest weight of the evidence.**

**Second Assignment of Error**

**The trial court abused its discretion by adopting a blanket policy preventing recross-examination and denied Johnson a fair trial.**

*First Assignment of Error*

{¶8} In the first assignment of error, Johnson asserts that her conviction for tampering with evidence was not supported by sufficient evidence and was against the weight of the evidence.

*Standards of Review*

{¶9} It is well established that "[t]he legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), paragraph two of the syllabus.

{¶10} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St. 3d 259, 574 N.E.2d 492 (1991),

paragraph two of the syllabus. Consequently, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id*. "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33.

{¶11} By contrast, when reviewing whether a verdict was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). In doing so, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* Nevertheless, when assessing a manifest-weight challenge, a reviewing court must allow the trier-of-fact appropriate discretion on matters relating to the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

*Summary of Evidence Presented at Trial*

**{¶12}** Investigator Deana Lauck, an officer with the Lima Police Department who is assigned to the West Central Ohio Crime Task Force, was the prosecution's first witness at trial. (Tr., 158-159). Lauck testified that on January 12, 2021, she and other task force officers were engaged in a controlled drug buy investigation, the subject of which was Eric Henry, who lived at 830 Brice Avenue in Lima, Allen County, Ohio. (Tr., 160). Just prior to the controlled drug buy that had been set up between a confidential informant and Henry, Lauck was conducting surveillance of the residence at 830 Brice Avenue. (Tr., 160). Based upon prior surveillance of that house and other investigation by the task force, the officers believed that Lydia Johnson also lived in the home with Henry. (Tr., 162).

**{¶13}** Lauck testified that from the location where she parked on Brice Avenue on January 12, 2021, she could see the front of the suspect's residence at 830 Brice Avenue and also the driveway. (Tr., 164-165). As Lauck watched the house, Henry arrived at the residence, followed by Johnson about five minutes later. (Tr., 164-166). Johnson had two small children with her, who looked to be between the ages of two and five. (Tr., 166, 170). Upon arriving at the home, Johnson appeared to get something out of her vehicle, and then she walked inside the house after the children. (Tr., 166).

**{¶14}** Approximately five minutes after Johnson went inside the house, Investigator Lauck watched Henry leave the residence and drive westbound on Brice Avenue. (Tr., 166). Shortly after that, Lauck was advised by other task force members that Henry had arrived at the location where the controlled drug buy was to occur. (Tr., 167). Lauck

-5-

testified that the controlled buy was to take place at Dollar General, which is just a few blocks from 830 Brice Avenue. (Tr., 169).

{¶15} Minutes after being informed by other officers that Henry had arrived at the Dollar General location, Lauck observed Johnson run out of the front door of 830 Brice Avenue, get into her vehicle, and drive off westbound on Brice Avenue. (Tr., 167). Lauck testified that Johnson was literally running as she came out of the house, and that Johnson then drove away very quickly. (Tr., 167). When Johnson ran out of the house and drove off, she did not have the children with her. (Tr., 170).

{¶16} Investigator Lauck testified that Eric Henry had been placed under arrest by officers at the Dollar General location during the controlled drug buy. (Tr., 169-170). Investigator Lauck continued to watch the house at 830 Brice Avenue and, approximately four minutes after Johnson had driven away, she returned to the home and went inside. (Tr., 168).

{¶17} About half an hour after Johnson returned to the house, Investigator Lauck saw the hatch-door to the back of Johnson's vehicle go up, remotely. (Tr., 168). Lauck then observed Johnson come out of the house, carrying what appeared to be multiple grocery bags, which were white in color. (Tr., 168, 171-172). Johnson went to the back of her vehicle, which was parked in the driveway, and placed some items into the vehicle. (Tr., 168). Investigator Lauck watched as Johnson, still with at least one white grocery bag in her hands, walked towards an area between two garages at the rear of the property. (Tr., 168, 172-172). Lauck momentarily lost sight of Johnson as she walked further toward the

rear garage area. (Tr., 171). Johnson then reappeared from the garage area, walked back to her vehicle in the driveway, got in, and drove off. (Tr., 169). When Lauck watched Johnson walk to her vehicle from the area back by the garages, the investigator was unable to see if Johnson still had anything in her hands at that time. (Tr., 172).

{¶18} After observing Johnson's activities just prior to her leaving the house for the second time, Investigator Lauck called for a uniformed officer, Patrolman Torres, to stop Johnson's vehicle, based on Lauck's suspicion that Johnson was possibly tampering with evidence. (Tr., 172-173). Upon Patrolman Torres stopping Johnson, the police found multiple guns inside the vehicle. (Tr., 173).

{¶19} Investigator Lauck testified that when the task force serves search warrants at the homes of persons who are dealing drugs, the officers often find guns in those homes. (Tr., 173). Lauck testified that drugs and guns go hand in hand, as persons selling drugs often keep guns in their homes to protect their drugs and their money. (Tr., 173). Lauck testified that because Eric Henry is a convicted felon under disability, it would have been a crime for a gun to be possessed by him in his home. (Tr., 173-174).

{¶20} Investigator Lauck further testified that law enforcement officers commonly serve a search warrant on the home of a suspected drug dealer after that person is arrested during a controlled drug buy, so that the police may search for money, drugs, guns, or other contraband that the suspect may be holding at their residence. (Tr., 174). In this case, after the controlled drug buy from Eric Henry, the task force obtained a search warrant for 830 Brice Avenue, as the investigators had reason to believe that Henry may have had

additional contraband in the house. (Tr., 174-175). During the execution of that search warrant, police located a grocery bag in the area between the two garages where Lauck had earlier watched Johnson walk towards with a white grocery bag in her hand. (Tr., 175). In the grocery bag that was located back by the two garages, officers found multiple pill bottles filled with different types of pills. (Tr., 175).

{¶21} Lauck also identified several photographs taken during the events about which she testified, depicting the house at 830 Brice Avenue, Johnson's vehicle parked in the driveway, and Johnson at the rear of the vehicle after she walked out of the house with the grocery bags in her hands. (Tr., 163-165, 171-172).

{¶22} During cross-examination, Lauck testified that it was approximately 4:30 in the afternoon when she observed Eric Henry arrive at 830 Brice Avenue, and then Johnson and the children arrived a few minutes later. (Tr., 177). Lauck confirmed that it was a few minutes after that when Henry left the house to meet the confidential informant at the pre-arranged location for the controlled drug buy. (Tr., 178). Lauck testified that, after Johnson raced out of the house a few minutes after Henry had departed the residence, a black Suburban arrived at 830 Brice Avenue, and Lauck followed the Suburban for two to three blocks when it drove away from the house. (Tr., 178). Lauck then returned to 830 Brice Avenue and resumed surveillance on the home. (Tr., 179). After that, an unidentified female arrived at the house on foot, and subsequently left with the children in another vehicle. (Tr., 179).

{¶23} Investigator Lauck further testified on cross-examination that it was approximately 5:30 p.m. when she observed Johnson loading the items into her vehicle. (Tr., 180). Johnson then left the house for the second time six to eight minutes later. (Tr., 185). Based upon the photographs that had been identified, Lauck was asked if her view of the house was limited, and she testified that it was. (Tr., 181).

{¶24} Finally, Lauck testified on cross-examination that it was approximately 5:45 p.m. when Johnson was pulled over by the uniformed officer at Lauck's request. (Tr., 185). Lauck testified that it was between six-thirty and seven o'clock that evening when the search warrant was served at the residence. (Tr., 185).

{¶25} During redirect-examination by the state, Investigator Lauck was asked about the black Suburban referenced by defense counsel in cross-examination. (Tr., 187). Lauck clarified that a black Suburban had pulled up to 830 Brice Avenue, that a person got out of the vehicle and went into the house, and that the Suburban then pulled away from the house a short time later. (Tr., 187). Lauck testified that she did not actually see anyone leave the house and return to the Suburban before it pulled away, but said that she may have been busy with other aspects of the surveillance. (Tr., 187). Lauck was also asked on redirect-examination about the female who had arrived at the house on foot. (Tr., 187). Lauck confirmed, as she had testified to previously, that another vehicle pulled up and the children left in that vehicle with the woman who had arrived on foot. (Tr., 187-188). Finally, Lauck was asked about her range of view of the property at 830 Brice Avenue, compared to what was shown in the photographic exhibits, and Lauck testified that the camera had been

-9-

zoomed in while taking the photos, and so she actually had a wider view of the area with her own eyes. (Tr., 182).

{¶26} The state's second witness was Michael Haines, Chief of the American Township Police Department, who testified that in January of 2021, he had been employed by the Allen County Sheriff's Office, assigned to the West Central Crime Task Force. (Tr., 190-191). On January 12, 2021, Haines assisted in the controlled drug buy investigation involving Eric Henry, which occurred at the dollar store at the intersection of Jameson Avenue and North Street in Lima. (Tr., 191). Haines was assigned to the "take down team", whose focus was taking Henry into custody during the controlled buy. (Tr., 191). As Haines and the other officers were in the process of arresting Henry after the buy, Investigator Lauck radioed that Lydia Johnson had left the residence on Brice Avenue in a black Ford Explorer and was heading towards the dollar store. (Tr., 191-192). Based on that, Haines was on the lookout for Johnson and he then observed her driving through the dollar store parking lot. (Tr., 192). Chief Haines testified that Johnson did not stop at the dollar store; rather, she just drove into the parking lot on one side, and then immediately drove out the exit on the other side of the lot. (Tr., 192). After observing Johnson drive through the parking lot in that fashion, Haines advised Investigator Lauck over the radio as to what he had seen. (Tr., 192).

{¶27} On cross-examination, Haines testified that three other officers had been with him at Dollar General for the buy bust involving Eric Henry, being Detective Thomas, Investigator Montgomery, and Investigator Murphy. (Tr., 193). Haines testified that he did

not speak with Johnson when she drove through the Dollar General lot nor, to his knowledge, had any of the other officers. (Tr., 194).

{¶28} Patrol officer Rachel Torres of the Lima Police Department testified that she was working second shift on January 12, 2021 when she was asked to conduct a traffic stop of a person named Lydia Johnson. (Tr., 195-196). Torres, who was driving a marked patrol cruiser, located Johnson in her black SUV at the intersection of Brice and Baxter, which is not far from 830 Brice Avenue. (Tr., 197-198). Torres then stopped Johnson's vehicle. (Tr., 198). Torres approached Johnson's vehicle, and identified the driver as Lydia Johnson. (Tr., 199). Johnson advised that she had a firearm in the vehicle, and indicated it was on the passenger-side front floorboard. (Tr., 199-200). Johnson stated that she had a concealed carry permit for the firearm. (Tr., 200). A K9 officer also responded to the scene, and Torres overheard Johnson tell the other officer that there were additional guns in the vehicle's trunk. (Tr., 200). Patrolman Torres testified that, in addition to the gun on the front floorboard, officers found five firearms in the rear hatch cargo area of Johnson's vehicle. (Tr., 200-201). Torres testified that another firearm, which was loaded, was found under the driver's side seat. (Tr., 202). Torres also identified several photos of the firearms found in Johnson's SUV, which reflected that four of the guns found in the rear of the vehicle were inside of a white plastic grocery bag. (Tr., 206).

{¶29} During cross-examination, Patrolman Torres testified that Johnson stopped immediately after Torres turned on her lights and siren. (Tr., 210). Torres was asked about the K9 that had been called to the scene, and she testified that the dog alerted but no drugs

-11-

were found in the vehicle or on Johnson's person. (Tr., 212). Torres confirmed that the gun found under the driver's seat was loaded when found, but the other guns were unloaded. Torres was also shown a clip from her body camera video footage of the stop, and she testified that there was laundry detergent in the back of Johnson's vehicle. (Tr., 214-216).

{¶30} The next prosecution witness was Detective Evan Thomas of the Allen County Sheriff's Office, assigned to the West Central Ohio Crime Task Force. (Tr., 221). Detective Thomas testified that on January 12, 2021, he assisted in serving a search warrant at 830 Brice Avenue in Lima. (Tr., 222-223). Thomas was assigned to photograph items located during the search of the premises and, at trial, he identified and explained numerous photos he had taken at the residence. (Tr., 223-247). The detective identified photos of marijuana and marijuana paraphernalia found in the living room, photos of an AR-15 style rifle located in the home, photos of ammunition and photos of a large bundle of U.S. currency, also found in the home. (Tr., 236-244). Additionally, State's Exhibit 61 was identified as a photograph of a tied-off grocery bag that was located in a pile of items outside the residence, in an area between the garage of 830 Brice Avenue and the garage directly to the west of it. (Tr., 245). State's Exhibit 62 was a photo of the same white grocery bag, opened slightly to show a pill bottle inside the bag. (Tr., 246). State's Exhibit 64 was a photograph of all the pill bottles located inside of the grocery bag found between the two garages. (Tr., 247). State's Exhibit 65 was another photo, showing all of the pill bottles and the pills that were inside the bottles. (Tr., 247).

{¶31} On cross-examination, Thomas confirmed that the money was found in the basement, behind the dryer. (Tr., 249). Thomas testified that the AR-15 style firearm was also found in the basement. (Tr., 250).

{¶32} The state's fifth witness was Sean Osting, who previously had been employed with the Delphos Police Department and assigned to the West Central Ohio Crime Task Force. (Tr., 259-260). In January of 2021, Osting was the lead investigator in the investigation involving Eric Henry. (Tr., 261). In that capacity, Osting worked with a confidential informant who was making controlled buys with the task force officers. (Tr., 261-262).

{¶33} On January 12, 2021, the task force had a controlled buy set up with Henry, and the officers planned to do a "buy-bust", which means to apprehend the suspect in the process of the drug transaction. (Tr., 262). The controlled buy on January 12th took place at Dollar General, at the intersection of Jameson Avenue and Allentown Road in Lima. (Tr., 262). On that date, Eric Henry was taken into custody at the time of the controlled buy, and transported to the Allen County Jail. (Tr., 262).

{¶34} Osting testified that, prior to the buy, he had assigned Investigator Lauck to conduct surveillance at 830 Brice Avenue, to see if Henry left from that location before going to Dollar General. (Tr., 262-23). Osting testified that, over the course of the investigation of Eric Henry, the task force developed information that Eric Henry was living at 830 Brice Avenue. (Tr., 263). That investigation led officers to believe that Lydia Johnson also lived at 830 Brice Avenue, as her vehicle had been seen there, and her vehicle

registration listed the Brice Avenue address. (Tr., 263). The task force had also learned that Johnson and Henry have children together. (Tr., 263).

{¶35} Osting testified that throughout the course of the investigation, the task force had intended to serve a search warrant at 830 Brice Avenue once Henry was taken into custody. (Tr., 264). Osting prepared the search warrant and presented it to a judge, who approved it. (Tr., 265). Osting testified that, in serving that type of warrant, officers are looking for any items of evidentiary value, including drugs, drug paraphernalia, money, guns, and any other items associated with narcotics or that are illegal. (Tr., 266). Osting testified that guns are associated with drugs because it is common that drug traffickers use firearms to protect themselves and their money. (Tr., 268).

{¶36} Osting testified that when the search warrant was served at 830 Brice Avenue on January 12, 2021, officers found no persons in the residence. (Tr., 268). During the search of the residence, officers located drug paraphernalia, a large sum of money, a firearm, magazines and ammunition for firearms, and various pills. (Tr., 270).

{¶37} Osting identified a number of pill bottles that were found in a white plastic grocery bag outside of the residence. (Tr., 270-271). Osting located that bag full of pills next to the garage, toward the rear of the property, where there is a small area between the garage at 830 Brice Avenue and the neighboring garage. (Tr., 271). Osting specifically checked for evidence in that location due to Investigator Lauck having observed Johnson walking to and from that area earlier in the evening, with grocery bags in her hands. (Tr., 272). Osting identified photographs of the bag of pill bottles filled with pills, showing the

items in the location where they had been found and also showing the contents of the bag after it was opened by the officers. (Tr., 272-274). Osting testified that the pill bottles in the bag contained various types of pills. (Tr., 275).

{¶38} Osting's testimony further reflected that one of the pill bottles in the white plastic bag had the name of Eric Henry on the prescription label. (Tr., 276). The label indicated the prescription was for trazadone. (Tr., 277). Another one of the pill bottles had the name "Jovan Miles" on the prescription label, which was a prescription for oxycodone. (Tr., 277-278). Osting testified that oxycodone is highly addictive and commonly sold on the streets. (Tr., 278). Two other pill bottles found in the white grocery bag also had the name of "Jovan Miles" on the prescription labels. (Tr., 279-280). A fifth pill bottle found in the bag had no label on it. (Tr., 280-281). Osting testified that the pills were then counted, inventoried, and separated by type, in preparation to submit the pills to the Bureau of Criminal Investigation ("BCI") for testing. (Tr., 281).

{¶39} Osting identified the BCI submission sheet, and also the lab report received back from BCI after the testing was completed. (Tr., 282). The lab report reflected that the pills recovered in the white grocery bag included 80 oxycodone pills, one hydrocodone pill, and one capsule that was methylphenidate, all of which are controlled substances. (Tr., 283-287). Several other pills found in the bag were non-controlled substances. (Tr., 286).

{¶40} Osting testified that Eric Henry remained in the Allen County Jail following his arrest during the controlled drug buy on January 12, 2021. (Tr., 288). Osting explained that phone calls made by jail inmates are monitored and recorded on a database to which

the officers have access. (Tr., 288). Osting searched the database for Eric Henry's phone calls and reviewed some of the recorded calls that Heny made while incarcerated. (Tr., 288-289). Several of those calls contained conversations between Henry and Johnson. (Tr., 290). Osting identified State's Exhibit 72 as a recording of one of the phone conversations between Henry and Johnson, from a call placed by Henry on January 13, 2021, and State's Exhibit 72 was played for the jury. (Tr., 290-294).

**{¶41}** In the recorded phone call contained in State's Exhibit 72, Johnson stated that her savings had been taken from the house, and Henry asked how much money it was. (Tr., 294). Johnson replied that it was "sixteen bands." (Tr., 294). Osting testified that when someone refers to a "band", they are usually referring to one thousand dollars being banded together, so sixteen bands would equal sixteen thousand dollars. (Tr., 294). Osting identified State's Exhibit 60, which was sixteen thousand dollars in United States currency found by the task force in a shoe box behind the washing machine at 830 Brice Avenue. (Tr., 294-297). The money recovered in the search warrant was compared to the previously recorded serial numbers of funds used by the task force in the controlled drug buys from Eric Henry, and two hundred dollars of "buy money" was located, which was money used by the task force in a controlled drug purchase from Eric Henry on a date prior to January 12, 2021. (Tr., 295-297).

**{¶42}** Osting identified State's Exhibit 74 as a recording of another phone conversation between Henry and Johnson, from a different phone call placed by Henry from the jail. (Tr., 298). State's Exhibit 74 was played for the jury. (Tr., 299). In that

recorded phone call, there were references made by Henry to "medication" and five pill bottles, and "Jovan Miles". (Tr., 299).

{¶43} Finally, Osting testified during direct-examination that he spoke with Johnson during the course of the investigation and Johnson confirmed that she lived at 830 Brice Avenue, and had lived there for almost four years. (Tr., 300).

{¶44} During cross-examination, Osting confirmed that Eric Henry also had prior drug charges stemming from a different task force investigation in 2020. (Tr., 300-301). During the controlled drug buy from Henry that took place on January 12, 2021, Osting testified that he had been positioned near the location of the buy and had no part in the surveillance of 830 Brice Avenue on that date. (Tr, 301-302). Osting identified photographs from the search warrant showing receipts and other documents with Henry's name on them and an address of 830 Brice Avenue. (Tr., 302-304). Osting identified the inventory list of items recovered in the search warrant, and agreed that the bulk of the items had been found in the basement. (Tr., 304-306). Osting identified additional photos taken during the search warrant, depicting various locations in the home. (Tr., 306-307). Osting testified that he could not recall where the gun, which was an AR-style weapon, was found during the search warrant, but agreed that the inventory list reflected the gun was found in a basement closet. (Tr., 307, 312). Osting testified that other items in that same closet appeared to be men's shoes and men's clothing. (Tr., 307-308).

{¶45} Osting testified that a gun barrel found in the first floor living room closet was the original barrel for one of the firearms located in Johnson's car during the traffic stop.

(Tr., 308-309). Osting identified several more photographs taken during the search warrant, including one of the living room closet. Osting testified that, in that closet, investigators had located a gun case for a Glock firearm, Glock magazines with ammunition, a second case for a Glock gun, and another magazine, along with the gun barrel. (Tr., 309). On the top closet shelf were cases for guns from other manufacturers. (Tr., 309). Osting testified that, to the best of his recollection, the ammunition found in the closet matched the caliber of some of the guns located in Johnson's vehicle. (Tr., 311).

{¶46} Osting testified that he could not recall the exact time that he obtained the search warrant on January 12, 2021, but that he believed the search warrant was executed around 6:30 p.m. (Tr., 312-313).

{¶47} Osting agreed that in one of the recorded jail phone calls that had been played, Henry was instructing Johnson as to where a spare key for the house could be found. (Tr., 315). During the second call, Osting testified that Johnson appeared to be reading off the search warrant inventory list, a copy of which officers had left at the house after serving the warrant. (Tr., 314).

{¶48} Osting testified that it was approximately three hours between the time that Investigator Lauck had seen Johnson leaving the house and the time that the pill bottles were found outside the residence during the search warrant. (Tr., 316-317). Osting confirmed that the house had a front door and a back door, with the back door leading to the garage area outside. (Tr., 317-318).

{¶49} Osting confirmed his prior testimony that Johnson had told him that 830 Brice Avenue was a valid address for her. (Tr., 319). Osting testified that his conversation with Johnson was brief and that she did not appear distraught but perhaps kind of shocked. (Tr., 319).

{¶50} During redirect-examination, Osting testified that one of the documents recovered in the search warrant, an invoice from Ziebart dated November 17, 2020, had the name of Eric Henry on it with an address of 2267 East Elm Street in Lima. (Tr., 321). Osting confirmed that several other documents found during the search warrant listed the address of 830 Brice Avenue for Henry. (Tr., 321-322). Osting explained that a "magazine" is the part of a firearm that holds the ammunition. (Tr., 322-323). A magazine slides into the bottom of a gun and you cannot fire the gun without it. (Tr., 323). Osting confirmed that there was a Glock among the guns found in Johnson's vehicle. (Tr., 323). With regard to the timeframe between when Johnson left the residence on January 12, 2021 and when the search warrant was executed, Osting testified that Investigator Lauck continued surveilling the home until the search warrant was served. (Tr., 324). Osting confirmed that, while it may have been after 9:00 p.m. when he found the pills, Investigator Lauck had been surveilling the home the whole time, and that additional officers had been on scene at the residence from approximately 6:30 on. (Tr., 324-325).

{¶51} The state's final witness in its case in chief was Julie Addair, a scientist employed in the forensic chemistry section at the Ohio Bureau of Criminal Investigation and an expert in the area of controlled substance analysis. (Tr., 327-330). Addair testified

that she had conducted the testing of the pills submitted to BCI in the instant case, and identified the report documenting her findings. (Tr., 330-332). Addair testified as to the chain of custody of the pills at BCI, the testing that she had performed, and the reliability of the testing methods used. (Tr., 330-338). Addair testified that 80 of the pills were found to contain oxycodone, a Schedule II controlled substance. (Tr., 338-340). Addair testified that several pills were found to contain no controlled substance. (Tr., 340-341). Addair testified that another tablet was found to contain hydrocodone, and a capsule was found to contain methylphenidate, both of which are also Schedule II controlled substances. (Tr., 344-347).

{¶52} After the State of Ohio rested its case, the defense presented the testimony of four witnesses.

{¶53} Investigator Deana Lauck was the first witness called by the defense. (Tr., 360). Lauck testified that her report indicated that she started the surveillance at 830 Brice Avenue sometime prior to 4:35 p.m. on January 12, 2021, and that she estimated she arrived there around 4:20 p.m. (Tr., 361-362). When asked what time Johnson left the house the second time, just before she was pulled over, Investigator Lauck testified that her report indicated Johnson walked out of the house at 5:28 p.m., and she was in the driveway at 5:36 with the bags, so Lauck estimated that it was probably 5:40 p.m. when Johnson pulled out of the driveway. (Tr., 362). Investigator Lauck confirmed that she was present at the residence, watching the house, for that entire time, except for the three to four minutes that she spent following the other black SUV that left the area. (Tr., 361-363). Lauck was

shown photos she had taken during her surveillance, and she testified that she had been positioned a couple of houses to the west of 830 Brice Avenue. Lauck testified that her view was not limited by the house next door. (Tr., 364). Lauck testified that, while doing surveillance, she would also be using the radio and phone, as well as writing certain things down. (Tr., 364-365). Investigator Lauck confirmed that, from her position, she had a clear view of the front of the house and part of the driveway, but she did not have a clear view of the back of the driveway and the garage. (Tr., 365). Lauck also confirmed that she only saw Johnson make one trip to and from her vehicle, and that it was the back of the vehicle where Johnson went. Lauck testified that she could see when Johnson came back to the vehicle and then the vehicle pulled out and Lauck was able to tell it was Johnson in the vehicle. (Tr., 365-366). Lauck testified that if Johnson had gone to the passenger side of her vehicle, Lauck did not see that. (Tr., 365-366). Investigator Lauck testified that none of the photos of Johnson in the driveway show the bags in her hands, because her back was turned, but Lauck confirmed that she could see the bags when Johnson walked out, that Johnson had them in her hands, and then she went to the back of the vehicle. (Tr., 366-367).

{¶54} The second witness to testify for the defense was Eric Henry. (Tr., 371). Henry testified that he lives in Lima, is not married, and has three children, two of whom he shares with Lydia Johnson. (Tr., 372). The third child lives in Indiana. (Tr., 372). Henry testified that he had been employed at Dana for about a year. (Tr., 373). Henry said he was not really sure what Johnson does for a living, but it was some

-21-

kind of nursing. (Tr, 373). Henry testified that he and Johnson were previously in a romantic relationship for about eight years. (Tr., 373).

{¶55} Henry acknowledged that he had a pending criminal case, as a co-defendant to Johnson. (Tr., 374). Henry testified that prior to January 12, 2021, he had been arrested once before, about fifteen years earlier, for drugs. (Tr., 374). Henry testified that he was very surprised that Johnson was also arrested on January 12, 2021, because "she had nothing to do with anything" and was not aware of what Henry was doing. (Tr., 375). Henry testified that the recorded phone call from the jail was about the drugs that he was using at the time, and that his drugs of choice included pills, marijuana, cocaine, or whatever else he could get his hands on. (Tr., 376).

{¶56} Henry testified that the area by the garages where the bag of pills was found was where he kept his drugs, in order to keep them away from his kids and keep the children safe, and to hide his drug use from Johnson. (Tr., 376). Henry was shown photographs of the bag of pills and Henry testified that those were his drugs. (Tr., 377). Henry testified that an injury in 2010 had caused him to become addicted to pills. (Tr., 377).

{¶57} Henry was shown a photograph of a closet in his house, right by the front door, which he testified was kept locked and that he never used. (Tr., 378-379). Henry acknowledged that he had not previously contacted the police to tell them that Johnson had nothing to do with what happened. (Tr., 379). Henry identified an affidavit that he wrote in an attempt to clear Johnson's name. (Tr., 379-380). Henry stated that he was testifying

for Johnson in order to clear her name, even though testifying put him at risk due to his pending charges. (Tr., 381).

{¶58} Henry was asked about the basement in his home, and he testified that it was mainly his space. (Tr., 382). Henry was asked if Johnson lived there at the time of the arrest, and he testified that she had moved out at least eight to ten months before. (Tr., 382).

{¶59} On cross-examination, Henry testified that he was arrested at the Dollar General store at Jameson and North Street on January 12, 2021, after he had delivered some cocaine to that location. (Tr., 383). Henry testified that he had also sold cocaine at the same location on January 9, 2021. (Tr., 384). Henry testified that on both occasions, he had transported the cocaine in his hand. (Tr., 384). When asked who he was on the phone with on his way to Dollar General on January 12, 2021, he testified that he did not recall but that to his recollection it was not Johnson. (Tr., 384-385).

{¶60} When asked how long he had had the pill bottles that had been found, Henry said he does not keep track. (Tr., 385). When asked where he had obtained the pills, Henry testified that he did not remember. (Tr., 386). When asked about Jovan Miles, Henry testified that he did not know who that is. (Tr., 386). When it was pointed out that he mentions Jovan Miles in one of the recorded jail calls, specifically telling Johnson to call Miles and let him know his medication was there, Henry testified that he did not remember a Mr. Miles, but he did have a friend called "Brakes" who left some pills at the house. (Tr., 386). When asked if the pills he had belonged to Brakes, Henry testified that he did not remember. (Tr., 386). The recorded phone conversation in State's Exhibit 74 was then

played for Henry and, having refreshed his recollection, Henry testified that Jovan Miles was a friend who left some pills that Henry was abusing. (Tr., 388-390). Henry then added that Johnson was a medical assistant at the time, but that she had nothing to do with it. (Tr., 390).

{¶61} Henry acknowledged that, the day following his arrest, he told the investigating officer that he lived at 531 Brower Road. (Tr., 390). Henry testified that he had two addresses at that time, and that he lived at both. (Tr., 391).

{¶62} When asked what years he had been in a relationship with Johnson, Henry testified that it was from approximately 2012 to 2021, but that the relationship had ended eight to ten months before January of 2021. (Tr., 391-391). Henry testified that he had never told Johnson about his prior criminal conviction. (Tr., 392). Henry was shown photographs of a firearm found during the search warrant at 830 Brice Avenue and he testified he had never seen the gun before. (Tr., 393). Henry testified that he did not know firearm cases had been located during the search warrant. (Tr., 395). When asked if he recalled talking to Johnson in one of the recorded jail phone calls about the guns being hers, he testified that he did not remember. (Tr., 395). Henry testified that he knew after the fact that Johnson had a gun license but that she had never told him anything about having guns. (Tr., 395). When asked again about discussing the guns with Johnson in the recorded jail phone call, Henry again testified that he did not recall doing so. (Tr., 396). Henry testified that, during the course of his relationship with Johnson, there were

times that they lived together, but that he had never seen the guns that she owned. (Tr., 396).

{¶63} Henry was shown photographs taken in his house during the search warrant execution, and he acknowledged that there were children's toys in the basement, along with a container that he kept his marijuana in. (Tr., 397). Henry then added that the toys in the basement were ones his children had outgrown. (Tr., 397). Henry identified more drug paraphernalia in another photograph taken in his home, along with packets of marijuana depicted in a different photo. (Tr., 398).

{¶64} When asked about a photograph showing the bathroom in his home with hygiene products in view, Henry testified that the containers of women's deodorant and the women's lotion in the photograph belonged to him. (Tr., 398-399). Henry added that he uses a lot of women's hygiene products because they work better for him. (Tr., 399).

{¶65} Finally, Henry was asked where in the house he kept the cocaine that he sold on January 9, 2021 and January 12, 2021, and he testified that he kept it outside the house along with the pills, to keep the drugs away from his children. (Tr., 400).

{¶66} On redirect-examination, Henry testified that his inability to recall things from 2021 may be due to all the drugs he was using at that time. (Tr., 401).

{¶67} Debra Smith was the next witness called by the defense. (Tr., 403). Smith testified that she lives in Lima at 614 Shock Avenue and that she and Lydia Johnson have mutual friends. (Tr., 403). Smith testified that, until just recently, she and Johnson had been neighbors for the last couple years, with Johnson living above her. (Tr., 404). Smith

would see Johnson from time to time when they were neighbors. (Tr., 404-405). Smith testified that she had moved to Shock Avenue in 2020 and that, at the time of the trial, it had been about a year since Johnson had lived on Shock Avenue. (Tr., 405).

{¶68} During cross-examination, Smith confirmed that she had known Johnson for seven or eight years, and that she got to know Johnson after Johnson became friends with a friend of Smith's who knew Eric Henry. (Tr., 406). Smith testified that when she moved to Shock Avenue in 2020, Johnson was already living there. (Tr., 406-407). Smith testified that she had only been in Johnson's apartment on one occasion. (Tr., 407). Smith testified that occasionally she would see Henry on Shock Avenue when he would come to pick up the children. (Tr., 407).

{¶69} The last witness called by the defense was Lydia Johnson. (Tr., 411). Johnson testified that she is unmarried but has two children with Eric Henry. (Tr., 412). Johnson met Henry when she was seventeen and their first daughter was born two years later. (Tr., 412). Johnson testified that, at the time of trial, she and Henry had not been in a romantic relationship for a few years and she had moved out of 830 Brice Avenue at the end of January of 2020. (Tr., 413). Johnson is a licensed practical nurse. (Tr., 414).

{¶70} Johnson testified that on January 12, 2021, she picked her children up from daycare shortly after 4:00 p.m. and took them to their father's house, as Henry was going to watch the children while she was at work that night. (Tr., 414-416). Upon arriving at 830 Brice Avenue, the children ran inside and Johnson followed, after getting something out of the car. (Tr., 417). Johnson was supposed to work at 6:30 that evening, and so she

asked Henry if she could just hang out at his house for a couple of hours until she left for work. (Tr., 415-418).

**{¶71}** Johnson testified that Henry then left the house, saying he would be back. (Tr., 418). Johnson said that she then got a call from a friend on Snapchat, after which she left the house and went to Dollar General. (Tr., 418). Johnson testified that she pulled in at Dollar General and saw Henry outside of the car, with his hands behind his back, and several police officers around him. (Tr., 419). Johnson testified that she put her window down and asked an officer what was going on. (Tr., 419). Johnson testified that she then became upset because she believed Henry was getting arrested for drug possession. (Tr., 420).

**{¶72}** Johnson drove back to Brice Avenue, parked in the driveway, went into the house, and called off work. (Tr., 420). Johnson testified that she called a family member who lived around the corner to ask if they could watch the children while she got some things out of her house. (Tr., 420). Johnson then corrected her testimony and said, "or * * * my things out of his house." (Tr., 420). Johnson testified that even though she had called off work, she called her cousin to watch the kids because she was going to be transporting a lot of items in her car, such as clothes, shoes, and toiletries, but also her weapons, and she did not want the children in the car with all the weapons. (Tr., 421). Johnson testified that she still had a few things at Henry's house, including a hair braiding rack and her weapons, which were locked in a closet to which she had kept the key. (Tr., 421). Johnson identified photographs showing the closet where she kept her firearms. (Tr., 422). Johnson

testified that she had forgot to grab the barrel that matched one of her guns. (Tr., 423). Johnson identified additional photographs, taken by Investigator Lauck, which showed Johnson in the driveway and also the braiding rack in the back of her vehicle. (Tr., 424). Johnson testified that she had left her guns on Brice Avenue because her new apartment did not have any locked area. (Tr., 425).

{¶73} Johnson testified that she made several trips to her car that day to load her things, including her guns, some of which were in white plastic grocery bags. (Tr., 425-426). Johnson testified that she has a concealed carry gun license. (Tr., 426). Johnson testified that she put guns in the back hatch area of her vehicle, except for one that was her "every day gun", which was on the front floor board. (Tr., 427). Johnson testified that she decided to move her items out of the house that day because she realized that Henry was still lying to her about dealing drugs. (Tr., 428). She testified that she had no knowledge of his prior felony conviction that prohibited him from possessing guns, although she knew he had been in trouble previously. (Tr., 428-429). When asked about the AR-style gun found in the basement by the police, Johnson testified that all of her firearms were in the upstairs closet. (Tr., 429).

{¶74} Johnson testified that once she got her stuff and the kids' stuff out of the house, she was going to drive to her house to store everything, until she could figure out what to do. (Tr., 429). She testified that, upon leaving 830 Brice Avenue, she drove in the opposite direction from her own home because she realized she had forgotten to give her son's diaper bag to her cousin and was going to drop it off around the corner. (Tr., 429).

{¶75} Johnson testified that she pulled out and drove just a short way before being pulled over by a police officer, although she did not know why she was being stopped. (Tr., 420). Johnson testified that she told the patrol officer that she had a CCW license and was armed, and then a K9 was brought to the scene to sniff the car. (Tr., 430-431). Johnson testified that the dog alerted to the vehicle and then the police searched the car and found the guns. (Tr., 431).

{¶76} Johnson was shown additional surveillance photographs taken by Investigator Lauck, and Johnson testified that the photos showed items she had removed from the house on Brice Avenue and loaded into the car, including the braiding rack, a container of Tide laundry detergent, a Brita water pitcher, and a bag containing her daughter's crayons. (Tr., 431-434).

{¶77} Johnson was then asked about the recorded phone conversations with Henry. (Tr., 434-435). Johnson testified that one conversation was about where to find a spare key to the house on Brice Avenue. (Tr., 434-435). As to the other conversation, when Johnson was heard to refer to Henry as "Babe", Johnson testified that she calls everyone "Babe". (Tr., 435). When asked about the fact that Henry refers to the money seized by police as Johnson's money, Johnson said that Henry lies about things but that she agreed with Henry's statement on the phone, even though it made her uncomfortable. (Tr., 435-437). Johnson testified that Henry made those statements about the money being hers in order to conceal his own role in the matters under investigation. (Tr., 438).

{¶78} Johnson testified that, following her arrest on January 12, 2021, she told the officer that she lived at 830 Brice Avenue because she was nervous and scared over having been arrested. (Tr., 438-439).

{¶79} Johnson was asked about the prior testimony in the trial about her having been seen going back to the rear of the property near the garage, and Johnson testified that she could have been walking near that area in order to get to the back door of the house after getting out of her vehicle. (Tr., 439-441). Johnson testified that she used the back door to enter the home when she arrived back from Dollar General, and also that she had walked to the rear of the property when letting the dogs out. (Tr., 441-442).

{¶80} Finally, Johnson testified on direct-examination that she left ammunition for her guns behind at 830 Brice Avenue because she was only worried about getting the firearms out of the house, not the ammunition. (Tr., 441-442).

{¶81} During cross-examination, Johnson testified that she had been a licensed practical nurse since January of 2018 and, in January of 2021, worked at a retirement facility where her responsibilities included tracheostomies, IVs, and giving medication, including narcotics. (Tr., 442-445). She testified that braiding hair was a hobby. (Tr., 445).

{¶82} Johnson testified that she first moved to 830 Brice Avenue in the summer of 2018 when she was pregnant with her son. (Tr., 445). At first, just Johnson and her daughter lived there, but then Henry moved in with her and the kids. (Tr., 445). Johnson testified that Henry then lived there consistently until January of 2020, which was when

she moved out. (Tr., 446). When asked if she had ever moved back into the house on Brice after January of 2020, Johnson testified that she and Henry had started to renew their romantic relationship in December of 2020, that she did not live there then, but had started to go over there more frequently and would stay over once in a while. (Tr., 446-447). Johnson testified that, except for the gun she carried every day, her firearms had remained in the house on Brice Avenue since January of 2020. (Tr., 447).

{¶83} Johnson testified that, when signing her bond in this case, she stated that she lived at 830 Brice Avenue but that was because the address was still on her I.D. (Tr., 448). When asked where she lived in August of 2022, she testified that she lived primarily on Symphony Street in Lima. (Tr., 447-448). When asked why she had renter's insurance through State Farm for coverage at 830 Brice Avenue in August of 2022, Johnson said that she must have put down that address because it was on her I.D. (Tr., 448). Johnson testified that the guns found at 830 Brice Avenue in the search by police were not hers and that she does not know who owns them. (Tr., 449).

{¶84} Johnson testified that in January of 2021, she knew Henry smoked marijuana and was also dealing other drugs. (Tr., 451). She testified that when she questioned him about those activities, he would become angry and deny it. (Tr., 451-452).

{¶85} Johnson testified that the security system at Brice Avenue was still in her name and that she had access to that system. (Tr., 452-453).

{¶86} Johnson confirmed that, following her arrest, she told the investigator that she had lived on Brice Avenue for four years. (Tr., 453). Johnson further confirmed that she

had previously been provided with the various photographs and police reports in discovery in the case, and she confirmed that there were documents found in the home on Brice Avenue with her name and the address of 830 Brice Avenue on them. (Tr., 453-455). Johnson testified that those documents were from 2018 and 2019. (Tr., 455).

{¶87} On redirect-examination, Johnson testified that she had recently opened a salon in Lima. (Tr., 456). As to her knowledge of Henry using drugs, Johnson testified that he would only confirm the marijuana but that she had started to suspect he used other drugs a few months before she moved out of Brice Avenue, which was one of the reasons she moved out. (Tr., 456-457). Finally, she testified that it was late at night on January 12, 2021 when she spoke with police, that she had been up since before 8:00 that morning, but that she took a nap during the day. (Tr., 457).

{¶88} After the defense moved for admission of its exhibits and rested its case, the prosecution called Investigator Deana Lauck as a rebuttal witness. (Tr., 493).

{¶89} During her rebuttal testimony, Investigator Lauck identified a photograph she had taken on January 12, 2021, showing Johnson's vehicle in the driveway of 830 Brice Avenue with the back hatch door, or tailgate, open. (Tr., 494). Lauck testified that she took that photograph a couple of minutes after she had seen the hatch open remotely, when Johnson was still in the house and before she carried items to the vehicle. (Tr., 494-495). Lauck testified that the photograph showed a braiding board already in the vehicle, along with a bottle of Tide, both of which Johnson had testified she carried out of the house

later. (Tr., 495-496). Lauck confirmed that, as she surveilled the home, Johnson then only made one trip from the house to the back of her vehicle. (Tr., 496).

{¶90} Investigator Lauck further testified that the pills found by police in the grocery bag outside the home during the search warrant had an approximate street value of $15,000.00. (Tr., 497). Lauck also testified that the cocaine sold by Eric Henry on January 9th and 12th of 2021, which he testified he stored outside of the house along with the pills, had an approximate street value of $800.00. (Tr., 498). Investigator Lauck testified that, based on at least two hundred search warrants she had been involved in serving during her career, it was not common to find drugs outside of a home. (Tr., 498). Lauck confirmed that, while Henry had testified he stored his drugs outside to keep his children safe, the police found marijuana inside the home, and that marijuana most definitely poses a safety concern for children. (Tr., 498).

{¶91} During cross-examination, Investigator Lauck again testified that she had been parked two houses down, to the left of 830 Brice Avenue, if one were facing the house. (Tr., 500). Lauck again confirmed that she left her surveillance location for a few minutes at one point and that, while parked and surveilling the house, she would have also been making notes and calling out information on the radio. (Tr., 509). Lauck testified that she consistently sat parked at her surveillance location except for those few minutes that she left to follow the other vehicle, and that the hatch on Johnson's vehicle had been closed at that time. (Tr., 501). Lauck testified that she could not say what had happened in the few minutes she was away from the house. (Tr., 501). Investigator Lauck confirmed, based

on her report, that the female who arrived on foot then left the house with the kids at 5:28 p.m., and it was a short time after that when the hatch on Johnson's vehicle was raised remotely. (Tr., 502-503). Lauck testified that the photographs she took show the hatch raised at 5:33 p.m., and the photograph showing Johnson at the rear of her vehicle was taken at 5:36 p.m. Lauck confirmed that, from her surveillance position, she would not have been able to see Johnson if she had gone to the front passenger side of her vehicle in the driveway. (Tr., 503-504). Lauck testified that a tree somewhat blocked her view of the driver's door on Johnson's vehicle, but that she had a clear view of the rear of the vehicle. (Tr., 504). Lauck testified that she had a partial view up the driveway, but that she could not see all the way up to the garage and could not see the back door of the house. (Tr., 505).

{¶92} On redirect-examination, Investigator Lauck confirmed that, when she left 830 Brice Avenue momentarily to follow the other vehicle, the house and driveway were not out of her view that entire time, as she had a view of the house while driving back to that location. (Tr., 505). Lauck testified that while conducting the surveillance, she could not see the exact area where the bag of pills was found, but that she had a partial view of the garage right next to that location. (Tr., 506). Investigator Lauck testified that her view was clear enough to know that Johnson walked back toward that area, and then pretty directly came back out. (Tr., 506). Finally, Lauck was asked why she stayed at 830 Brice after she knew that the arrest of Eric Henry had taken place. (Tr., 507). In response to that question, Lauck testified that it is very common for a drug suspect, when being arrested, to make contact with someone else to let them know to get things out of the arrestee's house,

because such persons suspect that the police might be coming to the house. (Tr., 507). Because of that, Lauck remained watching the house at 830 Brice Avenue so that no one could move more items out of the home before the police arrived with the search warrant. (Tr., 507).

*Analysis*

**{¶93}** Johnson was convicted of tampering with evidence in violation of R.C. 2921.12(A)(1), which provides:

(A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:

(1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]

**{¶94}** Thus, "[t]here are three elements of this offense: (1) the knowledge of an official proceeding or investigation in progress or likely to be instituted, (2) the alteration, destruction, concealment, or removal of the potential evidence, (3) the purpose of impairing the potential evidence's availability or value in such proceeding or investigation." *State v. Straley*, 139 Ohio St.3d 339, 2014-Ohio-2139, ¶ 11. "[T]he evidence tampered with must have some relevance to an ongoing or likely investigation" of which the defendant has knowledge. *Straley* at ¶ 16. "Knowledge that a criminal investigation is under way or is imminent is based upon a reasonable person standard." *State v. Hicks*, 3d Dist Union Nos. 14-07-26 and 14-07-31, 2008-Ohio-3600, ¶ 54.

{¶95} Regarding the sufficiency of the evidence in the present case, the evidence demonstrated that a drug investigation was underway, that Eric Henry was arrested pursuant to that investigation, and that Johnson was aware that Henry had been arrested for a drug crime. Shortly thereafter, Johnson was observed to carry white grocery bags out of Henry's residence, and to load some items in her vehicle, which turned out to be multiple firearms. Johnson was then observed to immediately walk to the rear of the property with at least one white grocery bag still in her hands, where she very briefly disappeared from view back in a secluded area between the home's garage and the neighboring garage. Johnson then almost immediately reappeared from that rear garage area, got into her vehicle, and drove away. No other persons came or went from the residence after that and, a short time later, in that same secluded area between the two garages, officers located a white grocery bag filled with, among other things, dozens of oxycodone pills, with oxycodone being a commonly abused and trafficked Schedule II controlled substance. There was also evidence presented that guns are quite commonly associated with drug crimes because drug traffickers use firearms to protect themselves, their drugs, and their money. Further, there was evidence presented that law enforcement officers commonly serve search warrants at the homes of suspected drug dealers after such persons are arrested during controlled drug buys, so that the police may search for money, drugs, guns, or other contraband that the suspect may be keeping at their residence. Finally, the fact that, almost immediately after Henry was arrested, Johnson left her very young children unattended, raced down the street to the arrest scene and back, and then proceeded to quickly empty

the house of drug-related contraband served to establish her knowledge that an investigation relating to the home was underway or was about to be instituted.

{¶96} For those reasons and based on all of the evidence presented, particularly when viewing the evidence in the light most favorable to the state, a rational trier of fact could find that Johnson knew there was a strong likelihood that the home would be searched by police following Henry's arrest and, further, that Johnson's actions were an attempt to remove and conceal evidence related to Henry's drug activities with the purpose of impairing its availability in the investigation.

{¶97} Thus, upon review of the record, we find that the prosecution presented sufficient evidence to support a finding of guilt as to each of the elements of tampering with evidence in violation of R.C. 2921.12(A)(1).

{¶98} As to the manifest weight of the evidence, Johnson argues that the evidence of her taking plastic bags away from the house did not amount to proof of her removing or concealing potential evidence, as that trial testimony was outweighed by evidence of inadequacies in the police investigation of Johnson's actions, by Eric Henry's testimony that Johnson knew nothing about the drugs and that he stored the drugs outside in the location where they were found, and by Johnson's testimony that she was merely moving items belonging to her out of the home.

{¶99} Contrary to Johnson's arguments, and having thoroughly reviewed the evidence presented at trial, we find no indication that the jurors lost their way by convicting Johnson of tampering with evidence. "A verdict is not against the manifest weight of the

evidence because the finder of fact chose to believe the State's [evidence] rather than the defendant's version of the events." *State v. Risner*, 3d Dist. Hardin Nos. 6-21-12, 6-21-13, 2022-Ohio-3877, ¶ 47, quoting *State v. Martinez*, 9th Dist. Wayne No. 12CA0054, 2013-Ohio-3189, ¶ 16. "Further, a 'fact finder is free to believe all, part or none of the testimony of each witness appearing before it.'" *State v. Allen*, 3d Dist. Auglaize No. 2-22-14, 2023-Ohio-340, ¶ 18, quoting *State v. Petty*, 10th Dist. Franklin Nos. 11AP-716, 2012-Ohio-2989, ¶ 38.

{¶100} Here, the jury was free to disbelieve Henry's and Johnson's claims that she did not live in the home, lacked knowledge of Henry's drug-related activities, and was simply moving her own firearms out of the home as a result of his arrest. This is particularly true as the trial testimony given by Henry and Johnson was replete with factual claims that were contradicted by other evidence presented at trial. Additionally, the jury could have easily found Henry's testimony about keeping the drugs outside to not be credible, when that testimony was considered in light of all of the evidence, but especially the evidence that the drugs found outside were worth approximately $15,000.00 and therefore unlikely to be kept in an unsecured location outdoors. Accordingly, we conclude that Johnson's manifest-weight argument is also without merit.

{¶101} The first assignment of error is overruled.

*Second Assignment of Error*

{¶102} In the second assignment of error, Johnson argues that the trial court committed reversible error in denying Johnson's trial counsel the opportunity to conduct a recross-examination of a prosecution witness after the state had engaged in a redirect-examination of that witness.

{¶103} Relative to that claim, the record reflects that Investigator Deana Lauck was called as the state's first witness at trial. After Lauck testified in response to direct-examination by the prosecution, she was then cross-examined by defense counsel. Following that, the prosecutor asked questions of Lauck during a brief redirect-examination. At the conclusion of that redirect-examination, the following exchange took place:

> THE COURT: Thank you. You may step down.
>
> MR. VILLEGAS [DEFENSE COUNSEL]: Your honor, I apologize. Re-cross for Miss Lauck?
>
> THE COURT: I don't do re-cross Mr. Villegas.

(Tr., 188).

{¶104} While the defense lodged no objection at trial to the court prohibiting recross-examination and made no proffer as to the question(s) sought to be asked, Johnson now argues on appeal that the trial court's denial of the opportunity for recross-examination reflected an impermissible "blanket policy" against recross-examination on the part of the trial court, and that the same amounts to reversible error.

{¶105} With regard to the general authority of a trial court to control the proceedings in its courtroom and place limits on the examination of witnesses in a criminal case, R.C. 2945.03 provides:

> The judge of the trial court shall control all proceedings during a criminal trial, and shall limit the introduction of evidence and the argument of counsel to relevant and material matters with a view to expeditious and effective ascertainment of the truth regarding the matters in issue.

{¶106} Similarly, Evid.R. 611(A) provides that "[t]he court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment. Evid.R. 611(B) provides that "[c]ross-examination shall be permitted on all relevant matters and matters affecting credibility."

{¶107} With respect to the specific issue of recross-examination, *State v. Faulkner*, 56 Ohio St.2d 42, 381 N.E.2d 934 (1978), is the primary legal authority in Ohio as to when an opportunity for recross-examination must be allowed to the defense in a criminal case.

{¶108} In *Faulkner*, the defendant-appellant argued that the trial court's refusing defense counsel the opportunity to conduct a recross-examination of a prosecution witness amounted to a denial of the defendant's right to confront the witnesses against him as guaranteed by the Sixth Amendment to the United States Constitution and Section 10, Article I of the Constitution of Ohio. *Id*., at 43-44.

{¶109} In addressing that claim, the Supreme Court of Ohio stated:

> Although a defendant must have the opportunity to cross-examine all witnesses against him as a matter of right, *Kent v. State* (1884), 42 Ohio St. 426; *Weaver v. State* (1929), 120 Ohio St. 97, 165 N.E. 569, the opportunity to recross-examine a witness is within the discretion of the trial court. *Liberty Mutual Ins. Co. v. Gould* (1976), 266 S.C. 521, 224 S.E.2d 715; *United States v. Morris* (C.A.5, 1973), 485 F.2d 1385. Only where the prosecution inquires into new areas during redirect examination must the trial court allow defense the opportunity to recross-examine. See *Alford v. United States* (1931), 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624.

*Faulkner*, *supra*, at 46.

{¶110} In *Faulkner*, the trial record reflected that the prosecution did not inquire into any new area during redirect-examination of the witness at issue but, rather, inquired only as to issues raised by defense counsel during cross-examination. *Id.* The Ohio Supreme Court then specifically held:

> [W]here, as in the cause Sub judice, no new matters are explored on redirect examination, it is not an abuse of discretion for the trial court to deny defense counsel's request to conduct a recross-examination. *State v. Jones* (1974), 110 Ariz. 546, 521 P.2d 978; *State v. Miles* (1976), 97 Idaho 396, 545 P.2d 484; *State v. McSloy* (1953), 127 Mont. 265, 261 P.2d 663; *State v. Fernandez* (1924), 157 La. 149, 102 So. 186.

*Faulkner*, *supra*, at 46.

{¶111} In *State v. Carter*, 3d Dist. Crawford No. 3-94-21, 1995 WL 73375, at *4 (Ohio Ct. App. Feb. 22, 1995), this Court applied the holding in *Faulkner* to a case where the defendant-appellant argued that comments made by the trial court at the start of the trial, which seemingly precluded the right of defense counsel to conduct recross-examination, constituted a violation of the defendant's right to cross examine the state's witnesses.

{¶112} In *Carter*, the record reflected that the trial court made the following comment prior to jury selection: "[y]ou also both understand there is the record on the examination of the witness; there is direct, there is cross, there is redirect and that ends it." *Id.* The state then called two witnesses at trial, and the defense had the opportunity to cross-examine both witnesses. *Id.* No new areas were explored by the prosecutor during redirect-examination of the state's witnesses, nor were there any requests by defense counsel to recross-examine the prosecution witnesses or objections by defense counsel to the trial court's comment. *Id.*

In addressing the claim regarding recross-examination in *Carter*, this Court noted:

Cross-examination is a well-established right; nevertheless, recross-examination is generally within the trial court's discretion. *State v. Faulkner* (1978), 56 Ohio St.2d 42, 46. It is only when a prosecutor, on redirect-examination, delves into new areas that a trial court must allow recross-examination by a defendant. *Id.*

*Carter*, *supra*, at *4.

Applying those legal standards to the facts in *Carter*, this Court held:

We find no abuse of discretion. Nor does this constitute plain error. However, we caution the trial court that blanket statements regarding no opportunity for recross-examination should be avoided since an accused must be allowed to do so if new areas are explored by the state.

*Carter*, *supra*, at *4.

{¶113} In *State v. Stanley*, 3d Dist. Auglaize No. 2-79-33, 1980 WL 351969 (Ohio Ct. App. May 8, 1980), this Court addressed a similar claim involving a trial court's seemingly arbitrary prohibition on recross-examination. In that case, following the state's redirect-examination of a witness, defense counsel tried to ask the witness another

question. *Stanley*, at *2. The prosecutor objected on the basis that the question was "beyond the scope." *Id*. The trial court sustained the objection and then said, "You are finished testifying. That'll be all." *Id*. The trial court also told defense counsel, "You don't, - You don't have the right to Re-cross on, after Re-direct, anyhow." *Id*.

{¶114} In analyzing the defendant's claim on appeal that the trial court had impermissibly prohibited recross-examination, this Court noted that there was no attempt by defense counsel to ask any other questions upon recross-examination. *Id*. We further noted that the recross-examination of a witness rests largely in the discretion of the trial court, that the record did not affirmatively demonstrate an abuse of that discretion and, as the trial court's remarks were made after the witness had left the stand, the comments were immaterial to the issue. *Id*., at *2-3. In so ruling, this Court stated:

> The essential point here is: there was no request apparent upon the record for any further redirect. The trial judge's statement "You are finished testifying" can be attributed to this absence of added questions as well as to any legal interpretation as to the scope of redirect.

*Stanley*, *supra*, at *2.

{¶115} In the instant case, notwithstanding the precedent discussed above that sets forth permissible limits on recross-examination, Johnson asserts that her conviction and sentence must be reversed on the basis of *City of Cleveland v. Umstead*, 8th Dist. Cuyahoga No. 109243, 2021-Ohio-10.

{¶116} In *Umstead*, the 8th District Court of Appeals, in a 2-1 decision, reversed an aggravated menacing conviction on the basis of the trial court's decision to not allow

Umstead's trial counsel to recross a witness who had been asked just two questions during redirect examination. *Umstead*, at ¶ 2. After the trial court denied defense counsel's repeated requests to recross-examine the witness, counsel asked why the request was denied and the trial court responded: "Because I don't do that in 12-B and it's my courtroom and I said no." *Id*., at ¶ 23. Without analyzing, pursuant to *State v. Faulkner*, *supra*, whether the prosecution had inquired into new areas during redirect-examination, the majority decision in *Umstead* instead simply found that the trial court's decision on recross-examination demonstrated a "blanket prohibition" on recross-examination that was an abuse of discretion. *Id.,* at ¶ 25.

{¶117} Based on the *Umstead* case, Johnson argues that the record in the instant appeal reflects that the trial court had a blanket policy against recross-examination that should similarly be found to be an abuse of discretion that denied Johnson a fair trial.

{¶118} As a general rule, it is true that blanket policies affecting the rights of criminal defendants are disfavored by the law and should not be employed by trial courts. *See*, *e.g*., *State v. Beasley*, 152 Ohio St.3d 470, 2018-Ohio-16 (finding a blanket prohibition on no-contest pleas, when established by the record, to be an abuse of discretion). Such blanket prohibitions imposed by a trial court are, by definition, arbitrary and therefore can amount to an abuse of discretion when utilized by a trial court "as a matter of course without any consideration of the facts or circumstances of each case." *Beasley*, at ¶¶ 12-13.

{¶119} However, as reflected by the prior decisions of this Court discussed *supra*, *State v. Carter* and *State v. Stanley*, analyzing whether a blanket policy was enforced in the context of a trial court prohibiting recross-examination involves careful consideration of the record to determine whether the defendant had the right to recross-examination under the circumstances at issue, whether it is clear from the record that the trial court arbitrarily denied that right, and whether the defendant was prejudiced as a result. *See also State v. Spirnak*, 10th Dist. Franklin No. 19AP-261, 2020-Ohio-6838, ¶¶ 31-34.

{¶120} In the instant appeal, as detailed above in the first assignment of error, the record reflects that no areas of questioning were explored by the prosecutor during the redirect-examination of Investigator Lauck beyond those raised during defense counsel's initial cross-examination of the witness. Accordingly, pursuant to the holding of the Supreme Court of Ohio in *State v. Faulkner*, *supra*, the trial court had full discretion to deny defense counsel's request to conduct a recross-examination in that instance.

{¶121} Moreover, the record in this case does not definitively establish that the trial court employed a blanket prohibition on recross-examination. When defense counsel inquired about recrossing Investigator Lauck following the redirect-examination, the trial court replied, "I don't do recross", with no further elaboration. Judged solely on its face, the trial court's statement could indicate that the court had a blanket policy against recross-examination, which would be impermissible. However, when the statement is viewed in the context it was made, it is also possible that the trial court's statement was simply a cryptic and incomplete way of expressing that the court does not permit recross-

examination where, as here, the prosecution did not delve into any new area of questioning during the redirect exam. Given that ambiguity, and also because the issue arose with only one witness, the record falls short of establishing that the trial court imposed an arbitrary blanket prohibition on recross-examination that could amount to reversible error.

{¶122} The second assignment of error is overruled.

*Conclusion*

{¶123} Having found no error prejudicial to the defendant-appellant, Lydia Johnson, in the particulars assigned and argued, the assignments of error are overruled and the judgment of the Allen County Common Pleas Court is affirmed.

*Judgment Affirmed*

**ZIMMERMAN and MILLER, J.J., concur.**

**\*\* Judge Gene A. Zmuda of the Sixth District Court of Appeals, sitting by Assignment of the Chief Justice of the Supreme Court of Ohio.**